St. Louis, Iron Mountain & Southern Railway Company
*v.* McCain.

Opinion delivered January 27, 1900.

1. Master and Servant—Negligence.—Proof that while deceased, an employee of appellant, under the orders of his foreman, was engaged in coupling cars at night on appellant's transfer track, eight or ten cars were placed on the other end of such track by other employees of appellant and shunted down to where deceased was at a high rate of speed, causing deceased to be knocked down and killed, is sufficient, in the absence of proof that any effort was made by appellant to ascertain if the track was clear, or that there was any means of controlling the cars thus shunted down the transfer track, to sustain a finding of negligence on the part of appellant. (Page 383.)

2. Contributory Negligence.—A switchman who is ordered to couple cars on a transfer track at night is justified in presuming that other cars will not be shunted against the cars he is ordered to couple without warning and without regard to his safety; and if he is killed by cars so shunted down the track, while in the discharge of his duty, the jury is justified in finding that he was not guilty of contributory negligence. (Page 384.)

3. Fellow Servants—Who Are Not.—The foreman of a switching crew and a switchman of another crew are not fellow servants, under Sand. & H. Dig., §§ 6248-9, not being of the same grade of employment. (Page 384.)

4. Damages—Excessiveness.—A verdict of $500 as damages for deceased's pain and suffering, and for $2,500 for pecuniary loss suffered by the children of deceased, will not be set aside as excessive where deceased lived four hours after he was injured, and suffered some pain, though the doctors could not say how much, and where he was earning, at the time of his death, $60 per month and had been in the habit of sending money to support his children. (Page 386.)

Appeal from Pulaski Circuit Court, Second Division.

Joseph W. Martin, Judge.

STATEMENT BY THE COURT.

The complaint charged that on March 16, 1897, plaintiff's intestate was employed by the defendant in its yards in North Little Rock as switchman; that on the night of said date he

was run over and killed, while switching cars, by reason of the negligence and carelessness of defendant's employees in the handling of its trains and the incompetency of its servants, and in violation of its rules, and in consequence of the incompetent and unskilful engineer in charge of the engine being used at the time; that the said Epple left two children, 6 and 10 years of age, surviving him; that he was 30 years of age, earning about $60 per month at the time; that his estate and next of kin were damaged in the sum of $25,000, for which plaintiff prayed judgment.

The answer denied each and every allegation of the complaint, and, for its complete defense, set up that Chas. C. Epple was guilty of negligence and carelessness amounting to recklessness in going upon the track between two cars, and in so acting as to be the direct and sole cause of his death, and that, had he not, by his own negligence, contributed to the same, the accident would not have happened.

After the jury had been impaneled, and the trial had commenced, the plaintiff asked leave to file an amendment to his amended complaint in which he charged: "That the foreman of defendant's switch crew, who were placing cars on said transfer track to be taken or hauled out on said Fort Smith road, negligently, carelessly and recklessly ordered the section of cars moved, which set said stationary cars in motion, to be kicked in or kicked in on said transfer track, without any warning to plaintiff's intestate, Epple, and without taking any care or precaution to ascertain if anyone was on the track, or to keep from setting in motion the stationary cars which ran over and killed the plaintiff's intestate, Epple; and by reason of such negligence and want of care on the part of such foreman the plaintiff's intestate was run over and mortally wounded, without any negligence on his part."

To the filing of this amendment to the amended complaint defendant objected, as setting up a new cause of action, and as coming too late and after the trial of the case had commenced. The court overruled the objections, and exceptions were properly saved by defendant.

Defendant then answered said amendment to the amended

complaint, denying each of its allegations, and charging that the said Epple, at the time of the injury, was engaged in the yards at Little Rock as a switchman, switching cars in said yards; that one of the hazards, dangers and risks of said work was that of getting caught between cars while switching, and that said Epple assumed the risk at the time he entered into the employment of the company; that his death was an accident, without fault on the part of any of the employees of defendant, said accident growing out of the contributory negligence of the said Epple.

Dr. J. W. Jenkins testified that Chas. Epple, alias Culver, was brought to the Missouri Pacific Hospital on the night of March 16th; that he was cut open in the stride, and was very badly injured by the car wheels passing over him.     He was in a dazed condition from the shock, and, although he lived about three hours, the shock was such that he did not suffer greatly on account of his injuries.

John Curry testified that he was a switchman, working with the switching crew of which the deceased was a member; that his crew was moving cars from the transfer track, while a switch engine and another crew were putting cars on the transfer track for his crew to move into another part of the yard; that his crew, with whom was deceased, backed down into the transfer track, then coupled up three cars; that he and deceased went across the track between the cars to the other track to look for links and pins.     "I suppose Epple got what he wanted while I walked on down to look for more.     I heard the lamp jingle, and I heard the deceased say, 'Oh, my God!  I am killed!' I holloed to our engineer not to move, for fear they would shove in; ran for the foreman of the switching crew, Harry Nolan; and when I got back there were several men around Epple."     Whenever switchmen want to get links, when they are not in the cars, as they generally are, they go and get them wherever they can find them.     The track where the injury occurred was curved, and held about thirty-four cars.     It was witness' and deceased's duty to couple the cars when they were backed down, and they were going to get the links for this purpose, and it was while Epple was returning across the track between the two

cars that the cars came together and caught him.   It was some-
where about 9:30 o'clock at night—after dark.   On cross-
examination witness stated that the yardmaster that night was
Con Curry, and had charge of both crews.   These two crews
were switching under the directions of the same night yard-
master, Con Curry; that his switch crew had pushed down on
the van or transfer track for the purpose of moving cars.
While the cars were standing there, he and deceased passed
across the track between the two cars for the purpose of get-
ting pins and links, and deceased had got his links and pins,
he supposed, and while going back was caught between the
two cars as they came together.

Harry Nolan testified that he was foreman of the switch
crew in which John Curry and Epple were working; that Chas.
Compton was switch foreman of the other crew.   Compton's
crew were pushing cars on the van or transfer track for wit-
ness' crew to take and distribute in the yards.   In other
words, they were transferring the cars from one part of the
yard to the other, Compton's crew delivering the cars, and his
(Nolan's) crew receiving them.

The record shows that about 9:30 on the night of March
16, 1897, Charles C. Epple was in the employ of the Iron Moun-
tain Railway Company as a switchman, engaged at work in the
Baring Cross yards.   He had sought employment from defen-
dant, and was working under the assumed name of Charles E.
Culver.   As such he had signed his application, and as such he
was carried on the rolls.   His divorced wife testified that the
reason he had changed his name was because he had been in
the American Railway Union strike of 1894; but, be this as it
may, the deceased, on the night in question, formed one of the
switching crew, working under the direction of Harry Nolan,
foreman.   Nolan's crew were at the time of the accident en-
gaged in receiving cars from the van or transfer track, which
were being placed there by another switching crew, working at
the north end of the transfer track, under one Compton, fore-
man.

Just before deceased was injured, his particular crew had
backed their engine up into the south end of the van or trans-

fer track, and there coupled onto three cars and stopped. This engine and three cars were standing on the south end of the van or transfer track, the engine facing south with three cars attached to it. While this engine and the three cars were thus standing still, deceased and switchman Curry, a fellow switchman, crossed the track with their lighted lanterns in their hands, hunting for links and pins, which, it seems, they expected to need in making the coupling with the cars coming in on the north end of the transfer track. Curry saw deceased turn with his lantern and start back over the track, supposing he had found what links and pins he was after. Just as the deceased stepped between the iron rails, an empty coal car moved back and caught deceased between it and the three cars standing still, and killed him.

At the same time this was occurring, on the north end of the van or transfer track was another switching crew at work under switch foreman Compton. This crew was placing cars in and upon the transfer track for the purpose of enabling the crew of the deceased to take hold of them and move them to those points in the yard where needed. The track both crews were working on was known as the van or transfer track, where cars were placed for distribution about the yard. Compton's crew was delivering the cars on the van or transfer track, while Nolan's crew, with which the deceased was working, was receiving them on the van or transfer track, and distributing the cars in the yard. Thus it was, while Compton's crew was pushing eight or ten cars down on the transfer track, deceased attempted to cross between the cars, and was caught and killed."

The court gave ten instructions at the instance of the plaintiff, thirteen for defendant, and refused one asked for by the defendant. The defendant, at the close of the testimony, moved the court to instruct the jury to return a verdict for the defendant, which the court refused to do. The defendant excepted to the giving of the instructions for the plaintiff, and to the court's refusal to give the one for it numbered thirteen. The jury returned a verdict for five hundred dollars for the pain and suffering by the deceased caused by the injury, and twenty-five hundred dollars for pecuniary

damages sustained by the children of the deceased, on account of his death.   The defendant filed a motion for a new trial, which was overruled, to which it excepted and appealed.

*Dodge & Johnson,* for appellant.

The evidence does not show any negligence on the part of appellant.   41 Neb. 860; 46 Ark. 567.   The deceased assumed the risk of such contingencies as the one which caused his death.   35 Ark. 602; 46 Ark. 388; 56 Ark. 209; 116 N. Y. 398; 15 Am. & Eng. Ry. Cas. 257; 82 Fed. 789.   If there was any negligence which caused decedent's death, it was that of a fellow servant.   Acts 1893, p. 68; Sand. & H. Dig., §§ 6248–9; 52 Ill. App. 641.   Since the statute of 1893 the old rule as to who are fellow servants has been changed only in so far as the statute specifies who are *not* fellow servants.   For the old rule, see:   42 Ark. 417; 58 Ark. 126; *ib.* 198; 61 Ark. 306; 54 Ark. 289; 58 Ark. 66; *ib.* 217.   Under the first section of the statute, therefore, decedent and Compton were fellow servants. They were fellow servants also, within the meaning of the second section of the statute making all employees of the same grade, working together and having no superintendence or control over each other, fellow servants.   63 Ark. 485; 35 S. W. 364; 1 C. C. A. 633; 109 U. S. 478; 58 Fed. 525; 13 Sup. Ct. Rep. 914, 919, 921; 56 Fed. 810; 27 Minn. 162, 165, 166; S. C. 6 N. W. 484; 31 Minn. 553; S. C. 18 N. W. 834; 58 Fed. 529; 111 U. S. 313; S. C. 5 Sup. Ct. Rep. 433; 138 U. S. 483; S. C. 11 Sup. Ct. Rep. 464; 125 Mass. 485; 3 C. C. A. 429; S. C. 53 Fed. 61; 56 Fed. 973–980; 3 C. C. A. 280; 52 Fed. 777; 123 U. S. 727, 733; S. C. 8 Sup. Ct. Rep. 266; 139 U. S. 469; S. C. 11 Sup. Ct. Rep. 569; 145 U. S. 593–606; S. C. 12 Sup. Ct. Rep. 905; 145 U. S. 611–618; S. C. 12 Sup. Ct. Rep. 972; 35 S. W. 365; 41 S. W. 72; 36 S. W. 432; 35 S. W. 364; 31 S. W. 333; 38 S. W. 818; 72 N. W. 806; 108 Ill. 288; 24 N. E. 627, 628; 108 Ill. 288; 121 Ill. 259; 112 U. S. 377; 114 Ill. 57; 116 U. S. 647; 14 Fed. 564; 15 S. W. 442; 41 Neb. 860, 865–6; 71 Mo. 164; S. C. 5 Am. & Eng. R. Cas. 610; 52 Ill. App. 641; 31 N. E. 808; 5 N. E. 187; 63 Fed. 107; 11 C. C. A. 56; 63 Fed. 114; 11 C. C. A. 63; 50

Fed. 728; 12 Am. & Eng. R. Cas. 610; *ib.* 648; 68 Ill. App. 244.

*W. S. & F. L. McCain,* for appellee:

It was the duty of the appellant to adopt proper rules and regulations for the safety of its switching crews.  28 Am. & Eng. R. Cas. 497, note; 12 Am. & Eng. R. Cas. 235.  Railway employees are fellow servants with each other only when they are working together to a common purpose, and are of the same grade, neither being entrusted with superintendence or control over their fellow employees.   Sand. & H. Dig., § 6249; 63 Ark. 477; McKinney, Fellow Serv. §§ 98, 99, 103; 2 Bailey, Pers. Inj. 92–3; 65 Ark. 140.

HUGHES, J., (after stating the facts.)   It is unnecessary to set out the instructions given and the one refused.   We find no error in the court's action for which the case should be reversed.

The questions in the case are:   1st.  Was the company guilty of negligence which caused the injury?   2d.   Were Compton, the foreman, and the deceased switchman, Epple, fellow servants?   3d.   Was Epple guilty of contributory negligence?

The evidence tends to show that Epple, the deceased, under Harry Nolan, foreman of the switch crew to which he belonged at the time of the injury resulting in his death, was engaged on the van or transfer track of the defendant's railway in coupling cars to be moved out by his crew, and which had been placed on said track by the crew at the other end of the track, working under the control and direction of Compton as foreman; that Compton ordered eight or ten cars put on his end of the track to be received by Nolan's crew at the other end of the track, and that these cars were sent or "kicked" down this track at a very considerable rate of speed, ran against cars standing on the track, and pushed them with great force against others in front of them; that Epple at the time was between the cars first struck and those in front, was knocked down and received injury, from which he died in about four hours.   The proof tends to show that Epple at the time was

in the discharge of his duty, coupling the cars struck to those in front; that this occurred in the night time about 9:30 o'clock; that the night was dark; and that it was raining. There is no evidence that any effort was made to ascertain if the track was clear, or if anyone was on the track, nor is there any evidence that there was any means of controlling these eight or ten cars that were thus "kicked" or "shunted" down this track, upon which men were constantly engaged in receiving and moving out cars, when such work was necessary. We are of the opinion that the evidence is sufficient to support the finding that sending the cars down this track in the manner stated was negligence.

Was the deceased switchman, Epple, guilty of contributory negligence? It appears that he was in the discharge of his duty. The night was dark, and it was raining. There is no evidence that he did not look and listen for the cars "shunted" or "kicked" on the transfer track before going between the cars to couple them. He was justified in believing, which he must have believed, that cars would not be sent down the track in the manner they were sent, without warning, and without regard to whether any one might be on the other end of the track. Contributory negligence is a question of fact for the jury, and must be proved, and by their verdict the jury have said that Epple was not guilty of it, and we think the evidence supports the finding.

Were Compton and Epple fellow servants? Under the decisions before the passage of the act of 1893 (Sandels & Hill's Digest, sections 6248 and 6249) they would be held to be fellow servants, because they were working in one common employment at the same time and place, to a common purpose, that was, the switching of cars. The first section of the act of 1893 (p. 68) reads as follows: "All persons engaged in the service of any railway corporation   *   *   *   who are entrusted with   *   *   *   superintendence, control or command of other persons in the employ of such corporation, or with the authority to direct any other employee in the performance of any duty of such employee, are vice principals of such corporation, and are not fellow servants with such employee."

The second section of this act is as follows: "All persons * * * * engaged in the common service of such railway, and who * * * are working together to a common purpose, of the same grade, neither of such persons being entrusted by such corporation with any superintendence or control over their fellow employees, are fellow servants with each other." We have found no statutes of other states exactly like ours. The Texas statutes are very nearly like ours.

In the view we have taken of this statute, as applied to this case, unless Compton was of the same grade as Epple, they were not fellow servants, because the second section of the act provides that if they were of the same grade, they were fellow servants, "neither being entrusted with any superintendence and control over their fellow employees." Now it seems apparent that they were not of the same grade; for Compton was a foreman, having superintendence and control over his fellow employees, while Epple was a switchman, obeying the commands of a foreman having superintendence and control of his fellow employees. It seems clear they were not of the same grade. Again, was not Compton entrusted with superintendence and control over his fellow employees? He certainly had superintendence and control of fellow employees of the class of switchmen of which Chas. Epple, the deceased, was one. We think it would be a strained construction to say that, because Compton had no immediate control at the time over Epple, who was under the superintendence and control of Harry Nolan, his immediate foreman, that therefore he was a fellow servant of Compton. This construction would put the men of one crew without protection from the carelessness of the foreman of another crew, which crew was obeying his commands, and could not reasonably be held guilty of negligence in such a case as this. Many decisions are cited by the appellant in its brief to show that the proper construction of such an act would make the foreman and the switchman fellow-servants, and such seems to be the tendency of some of them, especially decisions cited from Texas. But we do not agree to any such a construction, and think the conclusion to which we have arrived is in consonance with reason, and a proper construction of this act. Compton.

as the representative of the company, had the superintendance and control of the crew which was ordered to and did send eight or ten cars down the transfer track, which came violently in collision with cars being coupled by the deceased in the night time while it was raining, causing the injury to the deceased, who was of a class over a crew of which class Compton had control.

We think Compton, the foreman, and Epple, the switchman, were not fellow servants, under the circumstances of the case, under the act of 1893. We think that we are in harmony with *Kansas City, F. S. & M. Ry. Co.* v. *Becker*, 63 Ark. 485, on this question.

Were the damages excessive? We find the deceased at the time of the accident was earning a salary of $60.00 per month, that he frequently sent money to aid in the support of his children, as much as ten dollars at the time, and generally at the time the board bill of one of the children was due; that at one time he sent two twenty dollar bills; that the deceased lived four hours after his injury; that he suffered pain, how much the doctor could not tell. We think the damages not excessive.

Affirmed.