# Wytheville.

## Janie Pearl Froman, Administratrix of Robert E. Froman, Deceased, v. Chesapeake and Ohio Railway Company.

### June 16, 1927.

1.  Death by Wrongful Act—*Brakeman in Railroad Yard—Negligence of Railroad—Case at Bar.*—The instant case was an action by an administratrix to recover damages for the death of her decedent. Decedent was employed as a field brakeman in defendant railroad's yards. At the time of the accident decedent, with the knowledge of the conductor of the switching crew, was left with one car upon one of the tracks of the yard. The conductor, in the presence of decedent, uncoupled this car and left the knuckle open. It was decedent's duty to see that at the proper time other cars were coupled to this car. Open knuckles do not always couple automatically. In the course of the operation other cars were placed on this track. In order to avoid the sideswiping of these cars by another cut of cars, the switching conductor threw the switch back to this track and gave the engineer a shut-off signal with his lantern. The lantern went out and the engineer did not see the signal. The result was that this last cut of cars ran against the cut on the track where decedent was placed, with great force and violence, knocking the cars forward and causing them to run over and kill decedent.

    *Held:* That defendant railroad was negligent.

2.  Demurrer to the Evidence—*General Rule.*—The rule of decision on a demurrer to the evidence is that if the evidence is such that the jury might have found a verdict for the demurree, the court must so find, and enter judgment accordingly.

3.  Master and Servant—*Employee in Railroad Yard—Duty of Railroad Company to Protect Employees—Failure of Railroad to Exercise Ordinary Care.*—A railroad company is not required to exercise prevision for the protection of employees engaged in work in railroad yards, who can protect themselves against all dangers which are usually and naturally incident to the work in which they are engaged; but is liable, if knowing, or having cause to believe, the employee is in a place of danger, it fails to exercise ordinary care to protect him. While the company has a right to assume that its employees will look out for

their own safety against all damages naturally incident to the work in which they are engaged, they have no right to expect them to protect themselves against injuries which are due to the failure of the company to exercise ordinary care for their safety.

4. MASTER AND SERVANT—*Railroad Yards—Ordinary Care of Railroad— Case at Bar.*—In the instant case, an action for the death of a field brakeman in a railroad yard, ordinary care required a conductor of a switching crew to look and ascertain whether the last cut of cars which was kicked into track No. eight, where the brakeman was standing, with the knowledge of the conductor, had passed the clearance post, before kicking other cars along the lead track to track No. one. The conductor negligently and carelessly, in order to prevent a sideswipe, threw the switch to No. eight and sent another cut of cars, with great force and violence, against the cars on that track and thereby caused the death of decedent.

*Held:* That the railroad was negligent.

5. MASTER AND SERVANT—*Railroad Yards—Ordinary Care of Railroad— Contributory Negligence.*—A switchman who is ordered to couple cars on a transfer track at night is justified in presuming that other cars will not be shunted against the cars he is ordered to couple without warning and without regard to his safety, and if he is killed by cars so shunted down the track, while in the discharge of his duty, the jury is justified in finding that he was not guilty of contributory negligence.

6. NEGLIGENCE—*Two Ways of Doing a Thing—Adopting the Most Dangerous.*—In the instant case, an action by the administratrix of a field brakeman against a railroad company, defendant was negligent in that it could have avoided taking the life of plaintiff's intestate by adopting a safer way of shunting cars while engaged in a switching operation. Defendant might have abstained from throwing the switch until the first cut of cars had entirely cleared, or deferred the "kick" signal until they were seen to have entirely cleared the switch post.

7. MASTER AND SERVANT—*Contributory Negligence—Railroad Yards—Case at Bar.*—In the instant case, an administratrix sued a railroad for the death of her decedent. Decedent was a field brakeman employed in the railroad's yards and was killed during a switching operation when a cut of cars was negligently thrown into the track upon which he was standing. The defendant offered no evidence and there was nothing in plaintiff's evidence to prove that plaintiff's intestate was, under the circumstances disclosed by the record, as a matter of law, guilty of contributory negligence, which was the proximate cause of his death.

*Held:* That a demurrer to the evidence by defendant could not be sustained upon the ground that decedent was guilty of contributory negligence.

8. DEATH BY WRONGFUL ACT—*Contributory Negligence—Presumption that the Decedent Used Ordinary Care.*—In a negligence suit, where there is no eyewitness to the accident, it will be presumed, in the absence of evidence to the contrary, that the deceased used ordinary care and caution, which presumption is sufficient to permit recovery, if negligence is shown on the part of the defendant.

9. MASTER AND SERVANT—*Contributory Negligence—Railroads—Case at Bar.*—Under section 5792 of the Virginia Code, contributory negligence is no bar to a recovery in an action against a common carrier to recover damages for personal injuries to or for the death of an employee; but the damages shall be diminished in proportion to the amount of negligence attributable to such employee. In the instant case, the plaintiff sued for $10,000 and the jury returned a verdict for $7,500.

*Held:* That the verdict could not be set aside on the ground that the decedent was guilty of contributory negligence.

10. MASTER AND SERVANT—*Assumption of Risk—Duty of Master to Exercise Ordinary Care.*—The law requires the master to exercise ordinary care for the protection of his employee and the employee does not assume the risk of injuries which may result from the master's negligence.

11. MASTER AND SERVANT—*Railroad Yards—Foreseeableness or Reasonable Anticipation of the Consequence of Negligent Acts—Case at Bar.*—The instant case was an action by administratrix for the death of her decedent, a field brakeman in defendant's yard. Decedent was killed when he was standing on track No eight of the yard with the knowledge of the switching conductor and in performance of his duties. Defendant was guilty of negligence by the failure of the switching conductor to look and see that the lead track was fouled by the cars on No. eight track before starting a "cut" of cars over the lead track to track No. one, and in throwing the switch to No. eight, after the discovery was made, and driving the "cut" of cars intended for No. one with great violence against the cars on No. eight, resulting in the death of plaintiff's decedent.

*Held:* That it was immaterial that defendant could not foresee that such movement of the cars would result in injury to the plaintiff's intestate. Having negligently put an agency of danger in operation, it is responsible for all the damages which may naturally result therefrom.

12. NEGLIGENCE—*Proximate and Remote Cause—Foreseeableness.*—If the act of omission is of itself negligent and likely to result in injury to others, then the person guilty thereof is liable for the natural consequences which occur, whether he might have foreseen it or not. In other words, if the act or omission is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to

result in injury to others, then he is liable for an injury proximately resulting therefrom, although he might not have foreseen the particular injury which did happen.

13.  MASTER AND SERVANT—*Railroad Yards—Duty of Railroad to Employees.*—While a railroad does not owe a yard employee the duty of prevision which it owes a passenger or stranger upon its tracks and. yard employees should exercise a higher degree of care for their safety than employees in the less hazardous departments of work, yet the railroad company is not relieved of the duty to exercise ordinary care, under the circumstances of the case, for the protection of its yard employees.

Error to a judgment of the Law and Equity Court of the city of Richmond in a proceeding by motion for a judgment for damages.  Judgment for defendant. Plaintiff assigns error.

*Reversed and final judgment.*

The opinion states the case.

*English & Moss*, and *McC. G. Finnigan*, for the plaintiff in error.

*Leake, Leake & Spicer*, for the defendant in error.

WEST, J., delivered the opinion of the court.

Janie Pearl Froman, administratrix of Robert E. Froman, deceased, brought an action against the Chesapeake and Ohio Railway Company for $10,000 damages for negligently causing the death of her intestate.  The jury returned a verdict in favor of the plaintiff for $7,500, subject to the judgment of the court on the defendant's demurrer to the evidence.  The court sustained the demurrer and entered judgment for the defendant.  To that judgment this writ of error was awarded.

The plaintiff's intestate, Robert E. Froman, was in the employ of the defendant company as field brakeman on its Fulton yards, near Richmond, Virginia. His duties, speaking generally, required him to go from point to point on the yard, to keep track of space for cars, and space cars when switching into tracks, to inform the foreman when couplings are to be made and which tracks have cars on them, to open the knuckles, to make couplings, to put on and take off brakes, when necessary, and sometimes to throw the switches. The switching crew was made up of G. C. Christian, conductor and yard foreman, G. R. Baber, engineer, George Vermillera, fireman, Charles Stevens, brakeman, and Robert E. Froman, field brakeman.

The westbound Fulton yard, upon which the accident occurred, consists of a ladder or lead track, running nearly north and south in a straight line, the south end of which is known as track No. one, and eleven switch tracks, each about one thousand feet long, numbered from two to twelve, inclusive, which are by switches connected with the lead track, on the west side thereof.

[1] The accident occurred about one o'clock at night, while the crew were engaged in the switching operations necessary to classify cars for the Charlottesville and Potomac Yards. The twelve cars to be moved had been marked "Charlottesville" or "Potomac Yards," and were standing on track No. eight, upon which Froman was killed. By classifying is meant the placing of all cars destined for one point on one track, and those destined to another point on another track. When this has been done the yard engine picks up the different groups or "cuts" of cars and places them together on the lead or ladder track as "cars classified as a train." In doing the switching

necessary to group and place the twelve cars only the lead track, track No. eight and track No. one, were used.

G. C. Christian, sworn for the plaintiff, testified: "I told him (Froman) what I was going to do; Froman knew that I was going to switch what we class 'Potomac Yards' back to No. eight and the 181's ('Charlottesville cars') to No. one and pick up the 'Potomac Yards' out of No. eight and put the whole lot in No. one." "He knew just what tracks were being used."

Other facts which the evidence and proper inferences to be drawn therefrom tend to establish, will be stated during the course of this opinion.

All twelve of the cars which were coupled together on track No. eight were pulled forward and stopped about five car lengths from the switch. Christian, in the presence of Froman, then uncoupled B. & O. car 7605 by pulling the lever, and left the knuckle open. He left Froman at this point and, under his order, the train carried the eleven cars next to the engine out on the lead track and "kicked" the three cars farthest from the engine down the lead track to and beyond switch No. two upon track No. one and left them there. Christian then threw the switch, and four of the remaining eight cars were "kicked" back into No. eight to be coupled to B. & O. car No. 7608. Open knuckles do not always couple automatically, and it was Froman's duty to see that these cars were, at the proper time, coupled to the B. & O. car 7608.

The remaining four cars were pulled back on the lead track, to be "kicked" down the lead track to track No. one. Without looking to see whether the last four cars had gone into No. eight far enough to pass the clearance post, Christian signaled the engineer to "shunt" the remaining four cars down the lead

track some distance to track No. one. The engineer immediately executed this order and was pushing these cars with great rapidity down the lead track when Christian discovered that the last cut of cars "kicked'' into No. eight had not passed the clearance post, and would be "sideswiped" by the cut of cars which was then on its way to track No. one, and to prevent this "sideswipe" he threw the switch back to No. eight and gave the engineer a "shut-off" signal with his lantern. The lantern went out and the engineer did not see the signal. The result was that the last cut of cars ran against the cut on track No. eight with great force and violence, knocking the drawhead down on one of the cars and knocking the cars forward about five car lengths, causing them to run over and kill Froman. Froman's body was found about five car lengths down in the track and his hat and lantern were found about one car length nearer the switch. The "dirt was rumpled up" at that point, indicating that he had been hit there. Dr. J. Fulmer Bright, the coroner, testified that his death was due to traumatic injuries, and that his chest was crushed and his left foot mangled.

The defendant introduced no evidence and based the demurrer to the evidence on the following grounds:

"(1) That the defendant was not negligent.

"(2) That if it were, decedent was contributorily negligent.

"(3) That decedent assumed the risk which caused his death.

"(4) That the evidence fails to show in a manner required by law how and by what means decedent met his death, and fails to connect the defendant with the same."

[2] The rule of decision on a demurrer to the evi-

dence is that if the evidence is such that the jury might have found a verdict for the demurree, the court must so find, and enter judgment accordingly.

In Burks' Pleading & Practice (2d ed.), page 479, the law is stated thus: "In Virginia the rule of decision on a demurrer to the evidence has been stated in many cases to be that, where, upon the demurrer to the evidence, the evidence is such that the jury might have found the verdict for the demurree, the court must give judgment in his favor; and if reasonably fairminded men differ about the matter, the demurrer should be overruled."

(a) Was the defendant negligent?

[3] A railroad company is not required to exercise prevision for the protection of employees engaged in work in railroad yards, who can protect themselves against *all dangers which are usually and naturally incident to the work in which they are engaged;* but is liable, if knowing, or having cause to believe, the employee is in a place of danger, it fails to exercise ordinary care to protect him. While the company has a right to assume that its employees will look out for their own safety against all damages *naturally incident* to the work in which they are engaged, they have no right to expect them to protect themselves against injuries which are due to the failure of the company to exercise ordinary care for their safety.

[4] Ordinary care required Christian to look and ascertain whether the last cut of cars which was "kicked" into No. eight had passed the clearance post, before "kicking" other cars along the lead track to track No. one. He negligently and carelessly, in order to prevent a "sideswipe" injury to the cars, threw the switch to No. eight and sent the last four cars with great force and violence against the cars on that track

and thereby snuffed out the life of Froman. There is no evidence that N. Y. C. car which was nearest to B. & O. car No. 7608 was equipped with an automatic coupler, or, it if were, that the knuckle was open. Froman's duty required him to see that these cars were coupled, automatically or otherwise, at the proper time. He knew that a cut of four cars had been pushed in upon track No. eight, but he could not see that they had not passed the clearance post. He had a right to believe that the next movement would be to "shunt" a cut of cars down the lead track to No. one, and that no more cars would be kicked into No. eight until this had been done. But having lulled him into security, Christian, without notice to Froman, immediately threw the switch back to No. eight and sent the cut intended for No. one back into No. eight with great force and violence, which resulted in the death of the plaintiff's intestate. G. R. Baber, the engineer, called by the plaintiff, testified that they "ran into the cut of cars (cars on No. eight) like almost running into a solid wall." Froman had a right to assume that the movement of these cars would be made in the usual order and conducted with ordinary care and caution and not in a dangerous and reckless manner.

[5] The court, discussing the question of the defendant's negligence in *St. Louis I. M. & S. Ry. Co.* v. *McCain*, 67 Ark. 377, 55 S. W. 165, in which the plaintiff was seeking to recover damages for injuries received while coupling cars at night, said (syllabus): "Proof that while deceased, an employee of appellant, under the orders of his foreman, was engaged in coupling cars at night on appellant's transfer track, eight or ten cars were placed on the other end of such track by other employees of appellant and shunted down to where deceased was, at a high rate of speed, causing deceased

to be knocked down and killed, is sufficient, in the absence of proof that any effort was made by appellant to ascertain if the track was clear, or that there was any means of controlling the cars thus shunted down the transfer track, to sustain a finding of negligence on the part of appellant.  *  *  A switchman who is ordered to couple cars on a transfer track at night is justified in presuming that other cars will not be shunted against the cars he is ordered to couple without warning and without regard to his safety; and if he is killed by cars so shunted down the track, while in the discharge of his duty, the jury is justified in finding that he was not guilty of contributory negligence." And in the opinion it is said: "There is no evidence that any effort was made to ascertain if the track was clear, or if anyone was on the track, nor is there any evidence that there was any means of controlling these eight or ten cars that were thus 'kicked' or 'shunted' down this track, upon which men were constantly engaged in receiving and moving out cars, when such work was necessary.  We are of the opinion that the evidence is sufficient to support the finding that sending the cars down this track in the manner stated was negligence."

The case of *A., T. & S. F. R. Co.* v. *Butler*, 56 Kan. 433, 43 Pac. 767, involved the collision of cars on different tracks.  The court used this language: "In the parlance of railroad switch yards, when a car running or standing on one track is struck by a car, or cars, in motion on another track, before the two cars have sufficiently diverged to admit of the cars clearing each other, they are said to 'corner,' and it was a collision of this nature of cars running in the same direction upon different tracks which caused the death of Butler. Such an occurrence can hardly take place without the

fault of one person or more. * * * Common prudence would dictate that cars should not be cornered in railroad yards, and before a train is set upon a track those in the management of it should use reasonable diligence to see that it will clear the car or cars 'on another track, and a failure to do so may be negligence as toward employees working on the colliding cars."

In *Wabash Screen Door Co.* v. *Black* (C. C. A.), 126 Fed. 721, the court said: "In the absence of direct evidence as to the manner in which the person was killed, in an action for his death, while the jury should not be permitted to speculate, in the sense of guess, between different causes, the mere suggestion of theories by the defense which may have no reasonable foundation in the evidence does not reduce the matter to one of speculation, and disqualify the jury from determining the cause, where there is evidence which, although circumstantial, gives reasonable support to the allegations of the plaintiff."

In *Promer* v. *Milwaukee L. S. & W. R. Co.*, 90 Wis. 215, 63 N. W. 90, 48 Am. St. Rep. 905, in which plaintiff was injured by being struck by a rapidly moving car which was shunted on to the main track in the yards of the defendant where he was at work, without notice, the court held that the question of negligence was a matter for the jury.

In the syllabus in *Allen* v. *Wisconsin Cent. R. Co.*, 107 Minn. 5, 119 N. W. 422, we find this: "Although a switching crew engaged in making up a freight train in a railroad yard was not required to give notice to the crew of the train when cars were about to be connected, and when the train was finally made up, yet the switching crew was required to perform the work with reasonable care; and, if it was performed in a reckless or unusual manner, the railway company was not

excused from responsibility simply because the train crew commenced work upon the train under the supposition that the switching crew had completed its work. * * The members of a train crew were required to anticipate and assume the dangers attending switching operations when conducted in the usual manner; but they were not bound to assume the results attending reckless switching, and a brakeman was not necessarily guilty of contributory negligence in going between cars to couple up the air hose, acting upon the belief that the switching was practically completed."

[6] Defendant could have avoided taking the life of plaintiff's intestate by adopting a safer way. It might have abstained from throwing the switch until the first cut of cars had entirely cleared, or deferred the "kick" signal until they were seen to have entirely cleared the switch post.

(b) Was decedent guilty of contributory negligence?

[7] The defendant offered no evidence, and we find nothing in the plaintiff's evidence to prove that plaintiff's intestate was, under the circumstances disclosed by the record, as a matter of law, guilty of contributory negligence, which was the proximate cause of his death.

[8] "In a negligence suit, where there is no eyewitness to the accident, it will be presumed, in the absence of evidence to the contrary, that the deceased used ordinary care and caution, which presumption is sufficient to permit recovery, if negligence is shown on the part of the defendant." Jones on Evidence, Vol. 2, page 70.

[9] Besides, under section 5792 of the Virginia Code, contributory negligence is no bar to a recovery in an action against a common carrier to recover damages for personal injuries to or for the death of an employee; but the damages shall be diminished in proportion to

the amount of negligence attributable to such employee. Plaintiff sued for $10,000, and the jury returned a verdict for $7,500.

(c) Did decedent assume the risks which caused his death?

[10] The law requires the master to exercise ordinary care for the protection of his employee and the employee does not assume the risk of injuries which may result from the master's negligence.

In *Black* v. *Portland Cement Co.*, 104 Va. 450, 51 S. E. 831, the law is stated thus: "As a general rule a servant does not assume risks which may be obviated by the master by the exercise of reasonable care on his part. A failure on the part of the master to observe, for the protection of his servant, that reasonable degree of care which the circumstances of the particular case justly demand, is actionable negligence, and is not within the influence of the doctrine of assumed risks."

[11] The defendant being guilty of negligence in the failure of Christian to look and see that the lead track was fouled by the cars on No. eight track before starting the "cut" of cars over the lead track to track No. one, and in throwing the switch to No. eight, after the discovery was made, and driving the "cut" of cars intended for No. one with great violence against the cars on No. eight, it is immaterial that defendant could not foresee that such movement of the cars would result in injury to the plaintiff's intestate. Having negligently put an agency of danger in operation, it is responsible for all the damages which may naturally result therefrom.

[12] In *City Gas Co.* v. *Webb*, 117 Va. 272, 84 S. E. 646, the court said: "If the act of omission is of itself negligent and likely to result in injury to others, then the person guilty thereof is liable for the natural con-

sequences which occur, whether he might have fore-
seen it or not. In other words, if the act or omission
is one which the party ought, in the exercise of ordinary
care, to have anticipated was likely to result in injury
to others, then he is liable for an injury proximately
resulting therefrom, although he might not have fore-
seen the particular injury which did happen."

In *N. & W. Ry. Co.* v. *Whitehurst*, 125 Va. 260, 99
S. E. 568, the court said: "The 'foreseeableness,' or
reasonable anticipation of the consequences of a wrong-
ful or negligent act, is not the measure of liability of the
guilty party, though it may be determinative of the
question of his negligence. When once it has been
determined that the act is wrongful or negligent, the
guilty party is liable for all the consequences which
naturally flow therefrom, whether they were reason-
ably to have been anticipated or not, and in deter-
mining whether or not the consequences do naturally
flow from the wrongful act or neglect, the case should
be viewed retrospectively; that is to say, looking at
the consequences, were they so improbable or unlikely
to occur that it would not be fair and just to charge a
reasonably prudent man with them? If not, he is
liable. This is the test of liability, but when liability
has been established, its extent is to be measured by the
natural consequences of the negligent or wrongful act.
The precise injury need not have been anticipated. It
is enough if the act is such that the party ought to
have anticipated that it was liable to result in injury
to others." And at page 268 (99 S. E. 571): "A
servant cannot be held to have assumed the risk of a
dangerous or unusual condition brought about by the
negligence of the master, of which he was ignorant,
and could not have known by the exercise of ordinary
care."

Defendant relies on *N. & W. Ry. Co.* v. *Belcher*, 107

Va. 340, 58 S. E. 579; *Pittard* v. *Southern Ry. Co.*, 107 Va. 1, 57 S. E. 561; and *Aerkfetz* v. *Humphreys*, 145 U. S. 418, 12 S. Ct. 835, 36 L. Ed. 758.

In *N. & W. Ry. Co.* v. *Belcher*, *supra*, a section hand was run over by a switching train in the railroad yard where he was employed. Belcher, with a co-laborer, left the track on which they were working for an approaching train to pass. They stepped to a place of safety and when the train had passed Belcher immediately crossed the track upon which they were working and took his stand in the center of a parallel track, with his back to an approaching switching engine which was pushing several cars towards him, with the nearest car within sixty feet of him. The engineer of the backing switching train did not see him, and his brakeman did not see him until within fifteen feet of him. He at once notified his engineer who stopped his train as quickly as possible but not until it had struck Belcher. It was contended for the plaintiff that it was the duty of those in charge of the switching engine to keep a lookout to discover yard employees on the track.

It was conceded that the deceased was negligent in putting himself in a place of danger, but contended that the defendant was liable under the doctrine of last clear chance.

Under the law as it then was, in 1907, the contributory negligence of the plaintiff would bar a recovery, unless the defendant, after knowing the danger in which the plaintiff's intestate was, had a last clear chance to save the deceased and failed to avail itself of it.

The court held that those in charge of a switching train are "justified in presuming that the employees on a railroad yard, who are familiar with the constant

movement of such trains, will look out for themselves
and will not fail to leave a place of danger in time to
avoid injury;" and that there is no sufficient reason to
enforce "without limitation" in a railroad yard where
all the employees have equal knowledge of the con-
stant shifting of cars and equal facilities for protecting
themselves from the *"dangers naturally incident to such
work,"* the rule which requires the railroad company to
keep a lookout for passengers and strangers, where
they are expected to be upon the track.

In *Pittard* v. *Southern Ry. Co.,* 107 Va. 1, 57 S. E.
561, Pittard, a brakeman, was killed by an engine in a
railroad yard.  On the night of the accident two
engines, a double-header, were being driven along a
sidetrack, tender in front, to the trestle over Fall creek.
On this trestle there were three tracks, the eastern and
western sidetracks, and the main line.  The double-
header was on the eastern sidetrack.  Pittard was
standing between the track on the east and the main
track and gave a slow-down signal to the engineers of
the double-header, who brought their engines to a stand-
still.  A few minutes later Pittard was struck by an
engine moving backward along the main track in a
northerly direction.  The court held that "those en-
gaged in the yard limits are exposed to more than
ordinary peril, and should be on the alert and vigilant
to guard against the movement of engines and cars
always to be expected."  And further on in the opinion,
Keith, P., says: "There are certain correlative duties
on the part of the employee to the company:  One of
these is to use ordinary care to avoid injuries to him-
self, for the company is under no greater obligation to
care for his safety than he is himself    *    *    *."

In *Aerkfetz* v. *Humphreys,* 145 U. S. 418, 12 S. Ct.
835, 36 L. Ed. 758, a switch engine injured an employee

who was repairing the track in a railroad yard. The court, in the course of its opinion, used this language: "Under such circumstances, what negligence can be attributed to the parties in control of the train or the management of the yard? They could not have moved the cars at any slower rate of speed. They were not bound to assume that any employee, familiar with the manner of doing business, would be wholly indifferent to the going and coming of the cars."

As appears, the facts in these cases are unlike the facts in the instant case. In the *Aerkfetz Case*, the cars were moving very slowly, while in the instant case they were being driven with great force and violence. In the other two cases, the decedents negligently placed themselves on the track in front of an oncoming train which they could have seen in time to step to a place of safety. In the instant case, plaintiff's intestate did not know and had no reason to believe that the last cut of four cars would be recklessly driven into track No. eight, upon which he was standing.

[13] While these cases approve the rule that a railroad does not owe a yard employee the duty of prevision which it owes a passenger or stranger upon its tracks; and the rule that the yard employee should exercise a higher degree of care for his own safety than employees in the less hazardous departments of work, they nowhere hold that the company is relieved of the duty to exercise ordinary care, under the circumstances of the case, for the protection of its employees. It follows that these cases are not controlling in the instant case.

Christian was with Froman at the B. & O. car on track No. eight, and told him he was going to classify the twelve cars then on No. eight, and that he was going to put the 181's (Charlottesville cars) on track

No. one, and collect "Potomac Yards" cars on No.
eight, and later push them over to No. one.

At the time of the accident the *entire crew* was
engaged in classifying these cars.   The cars for the
"Charlottesville Yard" were being placed on track No.
one, and the cars for "Potomac Yards" temporarily on
No. eight track to be picked up later and placed on
track No. one.   Froman was needed at track No. eight
until the cars were classified, in order to see that the
couplings were made, whether the knuckles coupled
automatically or not.   He had no business requiring
his attention at track No. one until after the classifi-
cation was completed and the "Potomac Yards" cars
were pushed over on track No. one; nor had he any
business elsewhere in the yards while these cars were
being classified.

The first "cut" of cars kicked to No. eight went in
slowly and did not pass the clearance post.   They did
not extend down into No. eight quite four car lengths.
Froman's hat and lantern were found about *four car
lengths down in track No. eight,* and there were signs on
the ground indicating that his body was dragged from
that point to the place where it was found—about
five car lengths *down in the track.*   He had the right to
assume that the second "cut" of cars would not be
shunted into track No. eight.   It is clear he was
knocked down and dragged as a result of the second
"cut" of cars striking the first "cut" and driving them
violently forward, and not by the first "cut" of cars
moving into track No. eight, since the first "cut"
moved into No. eight slowly and did not reach the
point where his hat and lantern were found.

Our conclusion is, that upon the facts and circum-
stances shown in evidence and the just inferences
which may be fairly drawn therefrom, a jury might

have found a verdict for the plaintiff.   This being true, we must, upon the demurrer to the evidence, so find.

The judgment sustaining the defendant's demurrer to the evidence will be reversed and judgment will be entered here in favor of the plaintiff for the amount of damages ascertained by the jury in their verdict, with interest from the date of the verdict till paid, and costs.

*Reversed and final judgmen . .*

PRENTIS, P., and BURKS, J., dissenting.