# Richmond

## OLIVER T. GREGORY, BY, ETC. v. LEHIGH PORTLAND CEMENT COMPANY.

January 14, 1932.

Present, Campbell, C. J., and Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Curry & Carter* and *Taylor & Taylor*, for the plaintiff in error.

*J. M. Perry* and *Chas. J. Churchman*, for the defendant in error.

BROWNING, J., delivered the opinion of the court.

This was an action at law brought in the Circuit Court of Augusta county, in February, 1929, for damages for injuries to an infant, Oliver T. Gregory, occasioned by the explosion of a dynamite cap or caps on February 20, 1928.

The action was instituted by the infant, by his father, as his next friend. The parties will be referred to as they were related in the trial court. We here detail the established facts. The father of the plaintiff owned a small oblong tract of land containing about four acres which adjoined the lands of the defendant. In July, 1925, the line fence between these adjoining landowners was rebuilt and the defendant engaged itself to do this work in which two laborers, servants of the defendant, whose names were Thorpe and Fix, were employed. A number of holes had to be dug for posts upon which the wires were strung, of these a number, estimated from ten to twenty-three, were blasted by means of sticks of dynamite exploded by caps with pieces of fuse attached to them. To do this particular work the defendant sent its powder man, Hildebrand, who first loaded the holes to be blasted and then exploded them all, except perhaps two, at one time. The father of the plaintiff lived on this strip of land near its front end close to a State highway. At some distance to the rear of his dwelling, on the same tract of land, the father owned another dwelling house which was rented and occupied by a man named Ingram and his family, one of whom was Mrs. Sallie

Ingram, his mother-in-law, and his infant son about two years old. This house was in a grove which was the playground of the plaintiff, and the house was about twenty feet from the line fence. There was an old tool house located about fifty feet from the Ingram dwelling. After he set off the blasts Hildebrand shielded himself behind a tree. On the day the blasting was done Mrs. Sallie Ingram found a dynamite cap, of the same type of those which were used by the defendant, at the root of a tree about fourteen feet from the fence, and not knowing what it was, and therefore ignorant of its danger, she gave it to the infant child, her grandson, to play with. At that time Thorpe came by and noticing the child with the cap in its mouth took it from him and buried it. A short while thereafter and when the fence still had the appearance of being recently rebuilt, W. N. Gregory, an uncle of the infant plaintiff, found two of the same character of dynamite caps in the grass along the fence about twelve or fourteen inches from it lying between the posts. He disposed of them by throwing them in the bed of a stream near by. About a week after the fence was completed the infant plaintiff found three dynamite caps about three or four feet from the fence on the side of a path in the grass, not all together, but scattered, that is, in different places. He was at that time about ten years old and had never seen a dynamite cap before. His attention was attracted to them by their bright and shiny appearance. He did not know what they were or what their use was. He had a tin salve box and he put the dynamite caps and some marbles in it and closed the box and then placed it, with some other playthings, in a larger grocery box, which he took to the tool house, where his father was putting away some old implements and tools for safe keeping, preparatory to taking his family to Ohio. The father, without knowing what was in the box, placed it on a shelf and then locked and nailed securely the house, which was

not opened until February 20, 1928, the day of the accident. The wife and child, plaintiff, remained away from Virginia for two months and the father for eight months, the latter keeping the key to the tool house with him. After his return he never had occasion to go into the house until the date mentioned, at which time he was accompanied by the infant plaintiff who was then about twelve years old. His father opened and went in the house for a chain and when he came out he closed the door by hooking it. A short while after this the boy needed some wire to mend his little wagon wheel and he unhooked the door and went in and got the wire and returned a second time for more wire when he thought of his marbles and the shiny things, the dangerous character of which he was still ignorant, that he had put in the salve box. He got the box and could not open it and then he put it on a rock and struck it with a mattock. The caps exploded with great violence putting out the boy's right eye and fracturing his left knee.

The case was tried in October, 1930, and after hearing the evidence, and having a view of the premises involved, the jury rendered a verdict for the plaintiff, assessing the damages at $5,000.00. Subsequently, upon the motion of the defendant, the trial court set aside the verdict and entered judgment for the defendant with costs against the plaintiff, to which action a writ of error was awarded by this court.

Hildebrand, the defendant's powder man, knew that there was a small child at the Ingram house in the grove which was in close proximity to the fence at the point where the major part of the blasting was done. He testified that he had worked for the defendant company since 1891. The home of the plaintiff, during his entire life was very near the defendant's plant, and the plaintiff said that the grove was his regular playground and that other children were accustomed to play there with him. We may fairly assume, then, that Hildebrand knew this.

It will be noted that there are several salient facts which are not controverted and which stand out boldly, as important, in determining the issues here presented.

First: That the defendant was using dynamite caps with fuse in the work of blasting.

Second: That on the day of the blasting and shortly after the fence was finished such caps were found on three different occasions, by three separate and distinct persons, of whom the plaintiff was one, along the fence line and adjacent thereto.

Third: That the caps picked up by the plaintiff remained where they were placed in the tool house until the time of the accident.

Fourth: That the father was not aware of the presence of the caps in the box and the child plaintiff knew not of their danger at any time from the day they were found to that of the accident.

Fifth: That the plaintiff was a child twelve years old, who thinking of the playthings, at the time, including the caps, which he had put away, got the box and being unable to open it with his hands, struck the box with a mattock, and the caps exploded causing the very serious injuries complained of.

Sixth: That the caps were found by the plaintiff on his father's land, which was his regular playground.

The theory of the plaintiff was that the defendant, through its employees, handled its dynamite caps, sensitive and highly dangerous explosives, but bright and attractive to children, so carelessly as to leave some of them scattered about the premises; that this was the source of those found and exploded by the plaintiff.

The plaintiff's witness, Thorpe, who was an employee of the defendant, at the time of the blasting, was the only witness to testify to the fact of actually seeing caps scattered

or dropped on the ground at the time of the blasting. He was interrogated as follows:

"Q. Who was the powder man there?

"A. Mr. J. A. Hildebrand.

"Q. Do you know anything about him leaving any caps along that line?

"A. I don't know about his leaving any, but he left a few scattered when he first started. out, but he gathered them up and after that he took very good care of them.

"Q. How do you know he left a few of them? .

"A. I was there with him.

"Q. Did you call his attention to it?

"A. Yes, sir.

"Q. What did he do then?

"A. He gathered them up and put them in the box.

"Q. How far away was he when you told him that?

"A. About twenty steps.

"Q. And you told him that he had left some caps lying there?

"A. Yes, sir.

"Q. Whose land was it on? .

"A. Mr. Gregory's and I told him he had better go back and get them.

"Q. You knew they were exceedingly dangerous, didn't you?

"A. Yes, sir.

"Q. Did you go back there after he picked them up?

"A. No, sir.

"Q. How many did you see that he had left there?

"A. About three or four.

"Q. When they were blasting up there at that house they generally ran behind those trees in the yard, didn't they?

"A. Yes, sir."

Thus there was positive testimony that Hildebrand did,

at one time, leave caps scattered on the ground. That he gathered them all up and took very good care of them after that, could only have been the belief of a witness who was evidently reluctant to place any more blame upon him than a bare recital of the truth at that time would effect. The value of Hildebrand's denial of the truth of this testimony and his own declarations of his blamelessness of conduct in the matter are impaired when it is noted that he further testified that the blasting occurred in May, 1925, when the other testimony on this point was convincingly to the effect that it was in July, 1925. Again Hildebrand testified that he crimped all the caps at one place and carried them, with the fuses attached, to each hole to be blasted, while his co-laborers testified with equal positiveness that he crimped each cap at the particular post hole for which it was to be used. The effect of this matter is at once seen to be important for the reason that if the crimping was done at each hole the likelihood of dropping loose caps and leaving them on the ground was much greater.

■ Again there was some conflict in the testimony as to whether dynamite caps were had and used by other persons, including the father of the plaintiff, in the near vicinity of the blasting, and at about the same time or at a reasonable time before, going to show that others, than the defendant, might be responsible for the presence of the caps. On this point the weight of the testimony was with the contention of the plaintiff, and so, as to the presence of grass along the fence line. The verdict of the jury determined and settled these disputed questions of fact in favor of the plaintiff.

That negligence, where there is substantial evidence to show it, and from such evidence fair-minded men may honestly differ as to its existence in the precise case, is a question of fact to be determined by the jury, under proper instructions from the court, is the settled law in this State.

In the case of *Atlantic Coast Line R. Co.* v. *Church,* 120

Va. 725, 733, 92 S. E. 905, it was said by Prentis, J.: "It may be an unnecessary repetition, and yet the issue raised in this case suggests a restatement of the doctrine so clearly stated by Cardwell, J., in *Norfolk* v. *Anthony*, 117 Va. 777, 86 S. E. 68, namely, that it is well settled by the Supreme Court of the United States and this court by practically an unbroken line of decisions, 'that negligence only becomes a question of law to be taken from the jury when the facts are such that fair-minded men can only draw one inference therefrom. If fair-minded men, from the proofs submitted, may honestly differ, as to the negligence charged, the question is not one of law, but one of fact to be determined by the jury under proper instructions from the court.'" See long list of authorities there cited.

The contention of the defendant was:

(1) "There was no evidence to support the verdict.

(2) "Assuming that the defendant's powder man left the caps the plaintiff found, this was not the proximate cause of the plaintiff's injury."

■ We are not in accord with the first position taken by the defendant. In the light of the facts which we have pointed out as uncontroverted and shown to have existed, and in view of the conflict of the testimony relating to disputed facts, as to which, in our opinion, the decided weight and preponderance was on the side of the plaintiff, we not only cannot say that there was no evidence to support the verdict but we think there was substantial evidence upon which it was based. To hold otherwise, in this case, would be to usurp the province of the jury and unjustifiably invade their right and authority as triers of questions of fact. The evidence, fairly weighed, certainly made a case in which fair minded men might honestly differ as to the existence of the negligence charged.

The efforts of the defendant to show that other persons had dynamite caps in their possession and used them in the

vicinity of the accident and at about the same time, were wholly ineffectual. One of the witnesses, Craig, said that he used caps when blasting stumps in 1921 or 1922 and that this was three or four hundred yards from the Gregory property. Another witness, Sprouse, stated that he had been doing some blasting off and on for five years but this was six or seven hundred yards from the Gregory place and that he kept the caps hidden in the woods because they were dangerous.

The witness, William Jackson, testified that he looked in a garage, back of a house which he moved into, about three hundred yards from the Gregory house, and found a cement sack hanging on the wall with some dynamite in it and a round tin box, but he did not open the box and did not know what it contained.

Other evidence on this point was indefinite and uncertain. The jury was well justified in giving it little probative value.

As to the second contention which implicates the question of proximate cause, it is not free from difficulty in this case. It rarely is in any case. It is one of the nebulous and mystifying creatures of the law.

It has been repeatedly said by this court that opinions of the courts must be read and construed in the light of the facts appearing in the particular case which is the subject of the opinion.

The trial court, in its written opinion, and the defendant in its brief, to sustain the position that the negligence of the defendant in leaving the caps exposed where the plaintiff found them if it did so leave them was not the proximate cause of the injury, cited and quoted freely from the case of *Fowlkes* v. *Southern Ry. Co.*, 96 Va. 742, 32 S. E. 464. That case and the one in judgment are entirely dissimilar in the facts involved. In the cited case a mature woman purchased a ticket from one point on the company's road to a point of junction with another road, upon the

assurance of the agent selling the ticket that connection would be made at the latter point. The agent was mistaken and when the lady found she would be delayed for several hours, she hired a conveyance, horse drawn, and in the face of an impending storm, drove for miles over a rough country road, and being *enciente* at the time, she suffered a miscarriage and consequent injuries. This court properly held that the drive was an independent, supervening and controlling cause and was therefore the proximate cause of the injury. To state the circumstances of the *Fowlkes Case* is to emphasize its inapplicability to the case at bar.

The case of the *Ches. & O. Ry. Co.* v. *Wills*, 111 Va. 32, 36, 68 S. E. 395, cited and relied upon by the defendant, presents a state of facts entirely different from those obtaining in the present case.

Wills entrained at Gordonsville, Va., upon the wrong train. His purpose was to go east to his home and the train he boarded started west. He alleged that he was misled by the railway company. While the train was in motion he alighted and fell under the train and his leg was so crushed that it had to be amputated. The case was decided by this court upon a demurrer to the declaration. The court said that the negligence of the company consisted in such acts of omission and commission, alleged, as resulted in the plaintiff getting upon the wrong train, but the direct and efficient cause of the injury was the alighting from the train while it was in motion. The plaintiff was in a position of safety, the railway company was responsible for whatever loss or damage he sustained that could be traced to its negligence, but he chose to take the chances of alighting from a moving train. Of course such act was the intervening and independent cause of the injury and this court rightly held that the demurrer should have been sustained.

The eminent Chief Justice Keith delivered the opinion in the *Wills Case* and quoted with approval from Shearman

& Redfield on Negligence, at section 28, which said: "Very great difficulty has been found in determining what damages should be considered as flowing, in a 'natural and continuous sequence,' from an act of negligence, especially when it is not a matter of contract liability. On the one hand, it has been maintained that, in cases of tortious negligence, the defendant should be held responsible for all damages which do in fact result from his wrongful acts, whether they could have been anticipated or not. On the other hand, it has been maintained that he should not be held responsible for any damages except such as he could, in the exercise of reasonable foresight, have forseen as the probable consequences of his act. As a middle ground, it has been asserted that he should be made responsible for such damage as is known by common experience to usually follow such a wrongful act. The weight of authority seems to be decidedly against holding the defendant liable for all the actual consequences of his wrongful acts, when they are such as no human being, even with the fullest knowledge of the circumstances, would have considered likely to occur; and, on the other hand, the best authorities seem to be quite opposed to the theory that he should be held liable only for such consequences as he ought himself to have foreseen. So much difficulty, indeed, has been felt in attempting to lay down a rule to cover all possible cases, that some of the ablest judges have declined to state any fixed rule, and have indicated a disposition to leave all doubtful cases to the jury."

In the immediate case the trial court overruled the demurrer interposed by the defendant of which one ground was that from the averments of the declaration the leaving of the caps upon the premises was not the proximate cause of the injury to the plaintiff. Again, when the evidence was all in, the defendant moved to exclude the plaintiff's evidence, a prominent ground of the motion being that the

evidence did not show that the act of the defendant was the proximate cause of the injury, but quite to the contrary. The court declined to sustain the motion. The court instructed the jury, then, on the issues of the case, including that of proximate cause.

Very pertinent here is what was said by this court in the case of *Judy* v. *Doyle*, 130 Va. 392, at pages 405 and 406, 108 S. E. 6: "It is the province of the court to determine in the first instance whether or not the facts offered in evidence, tending to prove an injury to a plaintiff, are too remote from the defendant's act of negligence to constitute an element of the plaintiff's recovery. *Fowlkes* v. *Southern Ry. Co.*, 96 Va. page 742, 32 S. E. 464."

■ "But the trial court found itself unable to make this ascertainment of remoteness, and instructed the jury to determine from the evidence whether the defendants failed to exercise ordinary care, and whether this failure, if it took place, was the proximate cause of the plaintiff's injury. * * * 'The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science, or legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it.' *Milwaukee, etc., Ry. Co.* v. *Kellogg*, 94 U. S. page 469, 24 L. Ed. 256."

The case (*Judy* v. *Doyle, supra*) is illuminating as showing a veritable train of successive events or happenings unusual in occurrence, between the act of negligence of the defendant and the injury to the plaintiff, none of which this court would accept as an intervening superseding cause, which interrupted the causal connection between the original negligent act and the injury.

■ In the case of *City Gas Co.* v. *Webb*, 117 Va. 269, 84 S. E. 645, we find the following quoted with approval: "In *Pulaski Gas Light Company* v. *McClintock*, 97 Ark. 576, 134 S. W. 1189, 1199, 32 L. R. A. (N. S.) 825—an

asphyxiation case—the court, in its discussion of proximate cause, said that 'it is not necessary that the particular injury should have been foreseen,' and quoted from the Iowa case of *Foster* v. *Chicago, etc., Ry. Co.*, 127 Iowa 84, 90, 102 N. W. 422, 424, 4 Ann. Cas. 150, as follows: 'Doubtless the particular situation might not have been foreseen, but this was not essential to making out a charge of negligence. Accidents, as they occur, are seldom foreshadowed; otherwise many would be avoided. If the act or omission is of itself negligent and likely to result in injury to others, then the person guilty thereof is liable for the natural consequences which occurred, whether he might have foreseen it or not. In other words, if the act or omission is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others, then he is liable for any injury proximately resulting therefrom, although he might not have foreseen the particular injury which did happen.' "

See also *Fisher* v. *C. & O. Ry. Co.*, 104 Va. 635, 52 S. E. 373; *Norfolk & W. Ry. Co.* v. *Whitehurst*, 125 Va. 260, 99 S. E. 568; *Williams* v. *Lynchburg Tract., etc., Co.*, 142 Va. 425, 128 S. E. 732; *Farmer's Adm'x* v. *C. & O. Ry. Co.*, 144 Va. 65, 131 S. E. 334; *Froman* v. *C. & O. Ry. Co.*, 148 Va. 148, 138 S. E. 658.

From the case of *Barnett* v. *Cliffside Mills*, 167 N. C. 576, 83 S. E. 826, 828, the following quotations are taken: "As was said in *Fitzgerald* v. *Southern R. Co.*, 141 N. C. 530, 534, 54 S. E. 391, 393, 6 L. R. A. (N. S.) 337: 'It is very generally held that direct evidence of negligence is not required, but the same may be inferred from facts and attendant circumstances, and it is well established that if the facts proved established the more reasonable probability that the defendant has been guilty of actionable negligence, the case cannot be withdrawn from the jury, though the possibility of accident may arise on the evidence. Thus,

in Shearman and Redfield on Negligence, section 58, it is said: "The plaintiff is not bound to prove more than enough to raise a fair presumption of negligence on the part of the defendant and of resulting injury to himself. Having done this, he is entitled to recover, unless the defendant produces evidence to rebut the presumption. It has sometimes been held not sufficient for the plaintiff to establish a probability of the defendant's default, but this is going too far. If the facts proved render it probable that the defendant violated its duty, it is for the jury to decide whether it did so or not. To hold otherwise would be to deny the value of circumstantial evidence.'"

\* \* \* \* \*

"In *Powers* v. *Harlow*, 53 Mich. 507, 19 N. W. 257, 51 Am. Rep. 154, Judge Cooley says: 'Children, wherever they go, must be expected to act upon childish instincts and impulses; and others who are chargeable with a duty of care and caution towards them must calculate \* \* \* accordingly. If they leave exposed to the observation of children anything which would be tempting to them, and which they in their immature judgment might naturally suppose they were at liberty to handle or play with, they should expect that liberty to be taken.'

\* \* \* \* \*

"In *Brittingham* v. *Stadiem*, 151 N. C. 299, 302, 66 S. E. 128, 130, Justice Manning quotes with approval from *Mattson* v. *Minnesota, etc., R. Co., supra* 95 Minn. 477, 104 N. W. 443, 70 L. R. A. 503, 111 Am. St. Rep. 483, 5 Ann. Cas. 498: 'The degree of care required of persons having the possession and control of dangerous explosives, such as firearms or dynamite, is of the highest. The utmost caution must be used in their care and custody, to the end that harm may not come to others from coming in contact with them. The degree of care must be commensurate with the dangerous character of the article.'

\* \* \* \* \*

" 'In *Akin* v. *Bradley Engineering, etc., Co.* (48 Wash. 97) 92 Pac. 903 (14 L. R. A. N. S. 586), defendant has thrown some dynamite caps on a vacant lot in rear of its place of business. A path ran through this vacant lot, and school children used the path. Plaintiff was a boy of eleven years of age. The court said: "We think that when the respondent left these dangerous explosives by the wayside, where it knew that children, naturally attracted by such things, were constantly passing and repassing and playing therewith, it must be held to have known that such children were liable to cause some of said caps to explode in a manner likely to cause them serious injury, and that the explosion of such a cap by a dry battery in the manner shown herein did not constitute an intervening cause that should relieve respondent from liability." ' "

The following five citations are taken from 43 A. L. R. 434 (note):

In *Bunyan* v. *American Glycerin Co.* (1923), 230 Ill. App. 351, 23 N. C. C. A. 598, it is said that a person is generally held liable for any injury resulting from leaving explosives in a place accessible to children, or where they are wont to congregate under circumstances which do not make them wilful trespassers; and that the act of a child in causing the explosion is generally held not to be such an intervening cause as will relieve the defendant from liability for a breach of his duty. The case was one in which a used nitroglycerin can was left in the vicinity of a schoolhouse, where it was found by some of the children, one of whom struck it with a wrench, resulting in an explosion which killed the teacher (for whose death the action was brought) and several of the children.

And in *Mathis* v. *Granger Brick & Tile Co.* (1915) 85 Wash. 634, 149 Pac. 3, it was held that the action of the mother in taking from the pocket of the child the dynamite cap, of

the dangerous character of which she testified she had no knowledge, and placing it so that the child could easily obtain it again, could not be held as matter of law to be an independent, intelligent, intervening cause between the exploding of the cap to the child's injury and the negligence of the defendant in leaving the same easily accessible to children. The court said: "The respondent's primary negligence, which we have seen was a question for the jury, consisted in abandoning this cap in such manner that it was likely to fall into irresponsible hands, thus setting in motion a chain of causation from which might have been reasonably anticipated just such an injury as actually resulted. To say that this chain was broken, as a matter of law, by the unwitting failure of the mother to interrupt it, is to lose the logical perspective and take a distorted view of the relative importance of the incidents. It would be to eclipse the duty of one who knows of the dangerous character of an agency, to control it, by magnifying the innocent failure of another to imagine a danger of which she had no knowledge, into a positive duty to know and avoid it. It would be to miss entirely the basic principle of the exercise of reasonable care, which measures the duty by the magnitude of the danger reasonably to be anticipated by one possessed of the knowledge necessary to foresee it.

"In an action by a tenant for injuries to his children aged respectively two and six years, through an explosion of dynamite caps alleged to have been negligently left exposed by the defendant in a tool house on the defendant's farm, it was held in *Bryan* v. *Stewart* (1915), 194 Ala. 353, 70 So. 123, that the question whether the defendant observed the requisite degree of care which an ordinarily prudent person would have observed was for the jury, where there was evidence that he knew that the plaintiff's children frequented a way in close proximity to the tool house, and the tool house itself, the door to which was not fastened;

that the caps were in a box on a shelf about four feet from the floor, and that the children climbed on a barrel, took the caps from an unfastened box, and carried them home, where later they exploded one of them.

"So, where there was circumstantial evidence from which it might be reasonably inferred that employees of a municipality who were engaged in excavation work in a residential district, in which work they used explosives, had left, in a place accessible to children, a box containing dynamite caps outside the door of a shed for tools and explosives, and that the box was found by boys four and one-half and six years of age, respectively, who, not knowing of the dangerous character of the caps, exploded one of them to the injury of the younger boy, it was held in *Victor* v. *Smilanich* (1913), 54 Colo. 479, 131 Pac. 392, an action against the municipality for the injury, that, notwithstanding the direct and positive testimony of the defendant's employees to the effect that they did not leave caps at the place in question or at any place where children could have access to them, which testimony was not directly contradicted or impeached, it was the province of the jury to determine the weight of all the evidence, and that it was not erroneous to submit to the jury the question of the alleged negligence of the employees of the municipality.

"And where the defendant had dynamite and dynamite caps in his possession on his farm, used by him for blasting purposes, and about two months later sold the farm to the plaintiff, whose fourteen-year-old son, less than two months afterwards, was injured by the explosion of a dynamite cap which it was claimed was picked up by another child in the barnyard, it was held in *Eckart* v. *Kiel* (1913), 123 Minn. 114, 143 N. W. 122, 4 N. C. C. A. 311, that the court should have submitted to the jury the question of the defendant's negligence, instead of dismissing the case, there being evidence tending to show that no other dyna-

mite caps were used about the premises, even though the defendant's testimony as to the disposition which he made of the caps, namely, that he had returned them to a store, was not directly contradicted, as his testimony, where uncontradicted, could not be held true as matter of law in view of the fact that other evidence given by him as to material matters was directly denied by other witnesses."

The defendant has cited six cases from jurisdictions outside Virginia as authority for the position it takes with respect to the question of proximate cause but we find the facts in each one so utterly different from those in the present case that they afford little help here. They are *Carpenter* v. *Miller & Son*, 232 Pa. 362, 81 Atl. 439; *Horan* v. *Watertown*, 217 Mass. 185, 104 N. E. 464; *Perry* v. *Rochester Lime Co.*, 219 N. Y. 60, 63, 113 N. E. 529, L. R. A. 1917B, 1058; *Beickert* v. *G. M. Laboratories, Inc.*, 242 N. Y. 168, 151 N. E. 195; *Finkbeiner* v. *Solomon*, 225 Pa. 333, 74 Atl. 170; *Jacobs* v. *New York, etc., R. Co.*, 212 Mass. 96, 98 N. E. 688, 40 L. R. A. (N. S.) 41.

In the first case the plaintiff, a child twelve years old, was a tresspasser upon a dumping ground from which he and other children had been repeatedly warned. He knew what the fireworks known as "flower pot" was. He knew that it was an explosive and he intentionally applied fire to it. He found it in the debris on the dumping ground. The court held that his act in applying fire to the thing was the intervening act which was the proximate cause of the injury. We have no criticism of this decision.

In the second case the plaintiff and some other boys, ranging in age from six to fourteen years, took several sticks of dynamite out of a tool box which the defendant had left on the street and threw them upon a fire in an adjacent field and the plaintiff was badly burned by the ensuing explosion. The Massachusetts court said in part: "While the dynamite and the other contents of the box were left in such a

way that a thief might not find it very difficult to steal them, it cannot be said that the defendant was bound to anticipate that this might be done and to guard against the consequences that might follow if a thief should steal the dynamite and so use it as to do injury to others. The general presumption of innocence would be inconsistent with this. Still less was there reason to anticipate a series of thefts under the circumstances shown here, or to believe that such thefts would be committed in daylight, upon what seems to have been a pleasant Saturday afternoon, in so public a place." It is at once to be seen that the facts of this case and those of the case at bar are not at all similar.

In the third (N. Y.) case it was said by Cordoza, J.: "But we cannot say that what was done with these explosives was something that ought to have been foreseen. The chest, it is true, was open, but the caps were not exposed. A large wooden box hid them. The boys did not play with caps scattered about loosely. They did not play at all. They carried away a large wooden box containing thirty-three smaller boxes, and appropriated the contents. They stole the caps in quantities that must have carried notice, even to boys of their age, that their act was wrongful. Indeed there is good reason to believe that they stole, not for play, but for profit, intending to sell the spoils as junk. The defendant had done nothing to invite or provoke this theft. It had not scattered the caps about, or even exposed them to view, so that children might feel tempted, and perhaps licensed to handle and play with them. It had packed the caps in tins, and then hidden the tins from sight by packing them in wooden boxes. The theft of one of the boxes was no more to be looked for than the theft of the whole chest. It was possible, of course, that the contents would be stolen by boys, or even by adults. But nothing in the situation made that outcome probable. In short, a series of new and unexpected causes intervened and had

to intervene before these explosives could bring death to Perry. Not one of them was within the range of reasonable expectation. Boys discovered the hidden caps, stole a box, carried it to their home a half mile away, and killed a playmate. His death was not the proximate result of the open chest in the highway." Of course this is far from the case at bar.

*Beickert* v. *G. M. Laboratories, Inc., supra.* The defendant did not store films in the vacant lot. Its purpose was to burn them and thereby reclaim whatever silver had been used in the making of them. In the process of burning small pieces of the films would sometimes be carried into the air and would then settle down on the vacant lot. It was these pieces of film that the boys picked up. "There was no evidence that the films were of themselves inherently dangerous; in fact, they were not dangerous unless brought in contact with fire. If that were done, of course they would be easily ignited." The case was decided on the question of inherent danger of films.

In the case of *Finkbeiner* v. *Solomon,* 225 Pa. 333, 74 Atl. 170, the court said in part: "It cannot be said that placing a box of such caps upon a dark shelf in a barn is in itself a negligent act. If defendant had thrown the caps out, loosely, where children were likely to play, and would be apt to find them, the case would have been very different." The court also said that the duty was upon the parent, who bought the barn and moved it on the lot which he purchased, to inspect what was then his own building and look out for anything dangerous before he permitted his children to use it. Neither of the above cases are applicable.

*Jacobs* v. *New York, etc., R. Co.,* 212 Mass. 96, 98 N. E. 688, 40 L. R. A. (N. S.) 41. The injured boy in this case knew the thing he was projecting with was an explosive and the boy and his companions attempted to explode it and the injury was the result. The court said: "The

accident is deplorable, but the wrongful asportation which brought the intestate in contact with the exploding torpedo occasioned the mischief, * * *."

It is said in a note appended to the case of *Stephens* v. *Blackwood Lumber Co.*, 191 N. C. 23, 131 S. E. 314, 43 A. L. R. 426, 435: "It may be stated as a general rule that, owing to the dangerous nature of explosives, especially in the hands of young children, who cannot be expected to know and appreciate the danger, one who keeps or uses explosives must exercise a high degree of care to prevent injury to children who may have access to or come in contact with the same, the degree of care being commensurate with the dangerous nature of the object."

The jury, by their verdict, said that the defendant, in the immediate case, failed in the performance of this duty and that such failure was the proximate cause of the plaintiff's injury. We cannot say, in the light of all the evidence adduced, that they were mistaken or in error, nor ought the trial court, in our opinion, to have said so. Adopting the wording of some of the law writers, it is our judgment that the defendant set in motion a dangerous agency, and the subsequent events, culminating in the injury, were such as were consequent and natural and that none of them constituted an independent supervening cause; and therefore the negligence of the defendant in leaving the caps where it did was the proximate cause of the distressing injury.

We overrule the action of the trial court in setting aside the verdict of the jury, and we sustain said verdict and render judgment accordingly.

*Reversed and judgment.*