PRESENT: All the Justices

DEVINCHE JAVON ALBRITTON

v. Record No. 191030

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE D. ARTHUR KELSEY
FEBRUARY 4, 2021

FROM THE CIRCUIT COURT OF SUSSEX COUNTY
William A. Sharrett, Judge

DeVinche Javon AlBritton, an inmate in a state penitentiary, sued the Commonwealth of Virginia, alleging that he was injured while falling down stairs negligently maintained by the Department of Corrections ("DOC"). For three alternative reasons, the circuit court entered summary judgment dismissing AlBritton's complaint with prejudice. Disagreeing with each of these reasons, we reverse and remand this case for further proceedings.

I.

AlBritton's pro se complaint alleged that as an inmate in the Sussex II State Prison, he had tripped down a set of stairs that the DOC had negligently maintained. He claimed that the staircase was "damaged and missing edge pieces of concrete from a few of the steps of the staircase." J.A. at 2. A nurse treated him in the prison infirmary for pain in his "joints and ligaments" that affected his ability to ambulate. *See id.* His complaint included an affidavit stating that he had "exhausted the administrative remedies of the adult institutional inmate grievance procedure to the extent required and permitted by the Virginia Department of Corrections and its regulations." *Id.* at 4.

In response to AlBritton's complaint, the Commonwealth filed a plea in bar and a motion for summary judgment. The plea in bar asserted that the doctrine of sovereign immunity barred AlBritton's claim because he had not exhausted his administrative remedies, a precondition to filing a civil action pursuant to the Virginia Tort Claims Act, *see* Code § 8.01-195.3(7); *see also*

Code § 8.01-243.2.  The motion for summary judgment asserted that no genuine issue of material fact existed on the question of primary negligence or contributory negligence — in other words, no reasonable factfinder could conclude that the DOC had been negligent or that AlBritton had not been contributorily negligent.  Agreeing with these alternative assertions, the circuit court granted the plea in bar and motion for summary judgment.

## II.

On appeal, AlBritton challenges each of the three independent grounds relied upon by the circuit court in sustaining the plea in bar and granting summary judgment.  AlBritton first argues that he exhausted his administrative remedies under the Virginia Tort Claims Act, and thus, sovereign immunity does not bar his civil action.  He then contends that the issues of primary and contributory negligence presented material facts genuinely in dispute, making summary judgment inappropriate.  We find his arguments persuasive.

## A.

"The doctrine of sovereign immunity remains 'alive and well in Virginia.'"  *Pike v. Hagaman*, 292 Va. 209, 214 (2016) (citation omitted).  To the extent that some think this doctrine may be alive but unwell, we leave such policy reforms to the legislature because "[t]he General Assembly, not the courts, wholly occupies this field of law," *AGCS Marine Ins. v. Arlington Cnty.*, 293 Va. 469, 484 n.9 (2017).  Engaged in its policy-making role, "[t]he General Assembly has employed an incremental approach by enacting a limited waiver of immunity in the Virginia Tort Claims Act."  *Id.*  As applied to state prisoners, the Act partially waives sovereign immunity for "[a]ny claim by an inmate of a state correctional facility" if the inmate "verifies under oath, by affidavit, that he has exhausted his remedies under the adult institutional inmate grievance procedures promulgated by the Department of Corrections."  *See* Code § 8.01-

2

195.3(7).  That provision necessarily implies that if the verification were later proven to be false, it would be insufficient to trigger the statutory exception to the doctrine of sovereign immunity.

The exhaustion requirement should not be viewed as a gratuitous roadblock to prisoner litigation.  As the United States Supreme Court has observed, exhaustion statutes in the prison-litigation context are intended to "reduce the quantity and improve the quality of prisoner suits." *See Woodford v. Ngo*, 548 U.S. 81, 93-94 (2006) (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)) (interpreting the exhaustion requirement of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) (2000)).  The exhaustion requirement "protects 'administrative agency authority'" and "promotes efficiency" by encouraging disputes to be resolved "quickly and economically" during the prelitigation administrative process.  *Woodford*, 548 U.S. at 89 (citation omitted).

In this case, the circuit court held that AlBritton had failed to exhaust his administrative remedies, and thus, Code § 8.01-195.3(7) did not provide him with a statutory exception to sovereign immunity.  The court appeared to base this holding on an affidavit from the "Institutional Ombudsman" at the prison where the accident had occurred, *see* J.A. at 18.  The prison's grievance procedure, a copy of which is attached to the affidavit, describes three levels of grievance review after the inmate submits an unsuccessful informal complaint.

First, the inmate must send his grievance for a Level I review by the "Facility Unit Head" of the prison.  *See id.* at 20.  If dissatisfied with the Level I decision, the inmate may appeal the decision to the "Regional Administrator, Health Services Director, [or] Chief of Operations of Classification and Records" of the DOC, which is a Level II review.  *Id.* at 20; *cf. id.* at 32 (including also the "Superintendent for Education").  If that appeal is again unsuccessful, the inmate may appeal to the Director or Deputy Director of the DOC for a Level III review.  *Id.* at 20.  Time limits govern each level of the hierarchical appeal process.  An inmate has five days

3

from receipt of an adverse Level I decision to appeal for a Level II review and has five days from receipt of an adverse Level II decision to appeal for a Level III final review. *See id.* at 33.

By all accounts, AlBritton submitted a timely grievance for a Level I review. The warden issued a response on December 22, 2017, determining that the grievance was unfounded. The Institutional Ombudsman's affidavit asserts that "Albritton had 5 calendar days to appeal the Level I decision to the Regional Administrator, which he did not do. Therefore, he has not exhausted his administrative remedies" under the prison grievance procedure. *Id.* at 22. AlBritton's Level II grievance appeal, however, declares that it was "mailed to the Regional Admin . . . on this 25th day of December 2017 by placing it in the [prison] mailing system." *Id.* at 63.[1] On appeal, the Commonwealth argues that such mailing was insufficient because "under VDOC practice," grievance appeals are "submitted for purposes of exhaustion when they are *received* by VDOC, not when they are *sent*," Appellee's Br. at 15 n.5 (emphases in original), and the Regional Administrator never received a Level II appeal before the expiration of the five-day deadline.[2] The circuit court found this reasoning persuasive. We do not.

The grievance procedure states that "[t]he offender should be allowed 5 calendar days upon receipt of a response to appeal to the next level, if such appeal is available." J.A. at 33. A different provision adds: "Incoming grievances are to be dated/date stamped on the working day received . . . ." *Id.* at 30. The procedure also provides that "[t]he exhaustion of remedies requirement will be met only when the Regular Grievance has been accepted into the grievance

---

[1] A prison guard, "P.A. West," notarized AlBritton's Level II grievance appeal. *See* J.A. at 63.

[2] According to the Commonwealth, no prison official has ever received or even seen AlBritton's Level II appeal. *See* Appellee's Br. at 13-14. AlBritton's "Level III" appeal was received in February 2018 and treated as a Level II appeal because (according to the prison) there was never a Level II appeal. *See id.* at 21-22. *Compare* J.A. at 64 (requesting "a Level III response"), *with id.* at 65 (responding to a Level II appeal).

process and appealed through the highest eligible level without satisfactory resolution of the issue." *Id.* at 28.

We believe that the most reasonable interpretation of these provisions is that an inmate may timely send a Level II grievance appeal by placing it in the prison mailing system and that by doing so, the inmate has "appeal[ed]" the grievance "to the next level," *id.* at 33. The Commonwealth's contrary interpretation — that the inmate can only meet the five-day deadline when the DOC date-stamps its receipt of the grievance on or before day five — exposes the inmate to a risk over which he has no control. Under this interpretation, an inmate could deposit his grievance in the prison mailing system on day one and still be forever barred from pursuing the claim further in either administrative or judicial forums if the grievance was, for whatever reason, received on day six.

Given that the prison operates the prison mailing system by employees of the prison and for the benefit of the prisoners, it is difficult to see how or why an inmate should bear the risk of a delayed delivery of his mail — something completely outside of his control. Courts have factored this practical reality into their decisions in many similar contexts. *See, e.g.*, *Houston v. Lack*, 487 U.S. 266, 275 (1998) (reasoning that "pro se prisoners necessarily lose control over and contact with their notices of appeal . . . at delivery to prison authorities, not receipt by the clerk"). *See generally* Barbara J. Van Arsdale, Annotation, *Application of "Prisoner Mailbox Rule" by State Courts Under State Statutory and Common Law*, 29 A.L.R. 6th 237 (2007).

In this case, however, we need not adopt an inflexible rule for such situations. It is enough that the grievance procedure, reasonably interpreted, leads to the conclusion that the initial grievance and all later appeals are properly submitted when the inmate timely places them into the prison mailing system. This interpretation fits well with our admonition that an inmate, in order to exhaust his administrative remedies, should take "all reasonably necessary steps to do

5

so," *see Billups v. Carter*, 268 Va. 701, 710 (2004).  It is not reasonable to expect a prisoner to ensure that the prison actually delivers his mail.

Correcting the circuit court's mistaken view that the five-day appeal deadline should be measured by the date of receipt, rather than the date of mailing, still leaves an unresolved factual determination — the date on which AlBritton placed the Level II grievance in the mail.  On remand, the circuit court should determine whether AlBritton did in fact mail the Level II grievance within the five-day deadline.  If so, the circuit court should deny the plea in bar because AlBritton did all that he could have done to exhaust his administrative remedies and thus reasonably complied with the exhaustion requirement of Code § 8.01-195.3(7).  If not, the circuit court should grant the plea in bar because AlBritton failed to exhaust his administrative remedies and thus cannot avoid the Commonwealth's sovereign immunity by asserting a claim under the Virginia Tort Claims Act.

B.

We must also address the circuit court's entry of summary judgment on the issues of primary and contributory negligence because each of these rulings represents "a separate and independent basis for the judgment," *Manchester Oaks Homeowners Ass'n v. Batt*, 284 Va. 409, 422 (2012) (alteration omitted) (quoting *Johnson v. Commonwealth*, 45 Va. App. 113, 116-17 (2005)).  If the circuit court was correct on any of its alternative holdings, it would not matter for appellate purposes that the circuit court was wrong on either of the other two.

1.

Under Rule 3:20, "[i]f it appears from the pleadings, the orders, if any, made at a pretrial conference, the admissions, if any, in the proceedings, that the moving party is entitled to judgment, the court shall grant the motion [for summary judgment]."  The key phrase — "entitled to judgment" — requires the moving party to demonstrate that no "material" facts are

6

"genuinely in dispute." *See* Rule 3:20. It follows that immaterial facts genuinely in dispute or material facts not genuinely in dispute do not preclude the entry of summary judgment.

The materiality of a fact depends upon whether it is "a matter that is properly at issue in the case," *see Commonwealth v. Proffitt*, 292 Va. 626, 635 (2016) (citation omitted), a determination requiring the court to view the putative factual dispute through the prism of the controlling legal principles, *see* 1 Charles E. Friend & Kent Sinclair, Virginia Pleading and Practice § 13.03[2], at 13-6 (3d ed. 2017); Kent Sinclair & Leigh B. Middleditch, Jr., Virginia Civil Procedure § 11.7, at 863 (7th ed. 2020). A factual issue is genuinely in dispute when reasonable factfinders could "draw different conclusions from the evidence," *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009), not only from the facts asserted but also from the reasonable inferences arising from those facts.

When a summary judgment movant seeks to attack the claimant's prima facie claim, the materiality-sufficiency standard for summary judgment is no different from the standard used when considering a motion to strike or a motion to set aside a verdict as factually insupportable. *See Parker v. Carilion Clinic*, 296 Va. 319, 333 (2018); *Fultz*, 278 Va. at 88 (citing *Jenkins v. Pyles*, 269 Va. 383, 388 (2005), and applying the standard used in setting aside a verdict to a motion for summary judgment). *See generally* Sinclair & Middleditch, *supra*, § 11.7, at 864. The analogy also extends to appellate review of the sufficiency of the evidence in civil cases. *See Parker*, 296 Va. at 333. In all of these contexts, "[a] prima facie civil case — that is, the cluster of factual and legal assertions, which, if true, would authorize a judicial remedy — remains the same from the beginning of a judicial proceeding to its end." *Id.* The only thing that changes is what the court looks at when making the decision.[3]

---

[3] Though we have never directly addressed the issue, "[t]he prevailing wisdom in

The situation is quite different when a motion for summary judgment asserts an affirmative defense. In that situation, the burden of proof (when it involves the burden of persuasion rather than production)[4] rests solely on the civil defendant. A party seeking summary judgment on an affirmative defense must demonstrate that no reasonable factfinder governed by the applicable legal standard could *reject* the asserted defense on the merits. A court can enter summary judgment in the defendant's favor on the issue of contributory negligence "only when reasonable minds could not differ," *Jenkins*, 269 Va. at 389, in determining "that the plaintiff was negligent" and "that his negligence was a proximate cause, a direct, efficient contributing cause of the accident," *Karim v. Grover*, 235 Va. 550, 552 (1988) (citations omitted).

When courts follow these principles, summary judgment "achieves a salutary purpose," *Turner v. Lotts*, 244 Va. 554, 557 (1992), which is to "bring litigation to an end at an early stage," *Carson ex rel. Meredith v. LeBlanc*, 245 Va. 135, 140 (1993) (citation omitted), thereby saving litigants from the costs of an unnecessary trial on a meritless claim. When used incorrectly, however, summary judgment is a "drastic remedy" that withdraws genuine issues of material fact from the factfinder, usually a jury — the ancient adjudicative body that our legal tradition views as "the 'lower judicial bench' in a bicameral judiciary"[5] and "the democratic

---

Virginia is that affidavits are not admissible on summary judgment," Kent Sinclair & Patrick Hanes, *Summary Judgment: A Proposal for Procedural Reform in the Core Motion Context*, 36 Wm. & Mary L. Rev. 1633, 1692 (1995) (acknowledging but questioning this view); *see also* W. Hamilton Bryson, Bryson on Virginia Civil Procedure § 6.07, at 6-93 (5th ed. 2017) (stating that "[s]ummary judgment cannot be based on affidavits in Virginia practice" but citing only Virginia circuit court cases); *but cf.* Sinclair & Middleditch, *supra*, § 9.16, at 751. We need not decide this issue because the Virginia Prisoner Litigation Reform Act expressly allows affidavits to support or to oppose a motion for summary judgment in claims asserted by pro se inmates against the Commonwealth. *See* Code § 8.01-696.

[4] *See generally Denton v. Browntown Valley Assocs.*, 294 Va. 76, 86 (2017) (distinguishing between the burden of persuasion and the burden of production); *SunTrust Bank v. PS Bus. Parks, L.P.*, 292 Va. 644, 653-54 (2016) (same).

[5] Akhil Reed Amar & Les Adams, The Bill of Rights Primer 138 (2002) (quoting John

branch of the judiciary power."[6]  The judicial task when deciding such motions is to preserve the salutary purpose of summary judgment while not permitting it to drastically alter our historic respect for the role of juries.

2.

In this case, AlBritton asserts that the circuit court should not have entered summary judgment dismissing his negligence claim.  We agree.

The Virginia Tort Claims Act, when applicable, permits a claim against the Commonwealth for personal injuries "if a private person would be liable to the claimant" for causing the injury.  Code § 8.01-195.3 (omitting punctuation).  A private owner of real property, while not an "insurer of the invitee's safety," *Tate v. Rice*, 227 Va. 341, 345 (1984), nonetheless owes a common law

> duty to its invitee (1) to use ordinary care to have the premises in a reasonably safe condition for the invitee's use consistent with the invitation, and (2) to use ordinary care to warn its invitee of any unsafe condition that was known, or by the use of ordinary care should have been known, to the owner; except that the owner has no duty to warn its invitee of an unsafe condition which is open and obvious to a reasonable person exercising ordinary care for his own safety.

*Fobbs v. Webb Bldg. Ltd. P'ship*, 232 Va. 227, 229 (1986).  To fit his claim within this liability paradigm, "the plaintiff must introduce evidence of the responsible person's actual or constructive knowledge of a defective condition on the premises to establish a prima facie case

---

Taylor, An Inquiry into the Principles and Policy of the Government of the United States 209 (W. Stark ed., 1950) (1814)).

[6] *Id.* (quoting Essays by a Farmer (IV), *reprinted in* 5 The Complete Anti-Federalist 36, 38 (Herbert J. Storing ed., 1981)). *See generally* Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 11, 81-118 (1998).

of negligence." *Grim v. Rahe, Inc.*, 246 Va. 239, 242 (1993).[7]  The plaintiff must also establish

causation, *Sugarland Run Homeowners Ass'n v. Halfmann*, 260 Va. 366, 372 (2000),[8] an

essential element of all negligence claims.

To succeed on its motion for summary judgment, therefore, the Commonwealth had to

demonstrate that (i) there were no genuine issues of material fact and (ii) based upon the

indisputable facts, no reasonable factfinder could find that the Commonwealth was negligent and

that this negligence caused AlBritton's injuries.  No such showing was made in this case.

AlBritton's complaint asserted that while housed in a cell on the ground floor of the

prison, he walked up a staircase to shower on the upper floor.  When walking down the flight of

stairs after showering, he allegedly fell because several steps on the concrete stairway were

missing edge pieces and rubber stripping.  *See* J.A. at 2.  AlBritton made this claim multiple

times both before and during litigation.  *See id.* at 37, 39, 57-59, 64.  Photographs of the concrete

staircase support his claim that except for the bottom steps of the stairway, all of the other steps

leading up to the shower area were fitted with edge treads.

---

[7] It seems odd to compare a convicted criminal sentenced to a prison to an invitee, but that is the most apt analogy in this context.  Our prior cases have not delved into the nuances that might accompany a detailed analysis of the scope of a prison's premises liability to prisoners. There is little contest that a general duty of care exists, but the nature of that duty and the manner of its breach could in some cases be different in a prison context than in a typical restaurant, business, or private home.  The parties do not address such nuances, and for purposes of deciding this appeal, neither do we.

[8] The first step in determining factual causation "is often described as the 'but for' or sine qua non rule." *Wells v. Whitaker*, 207 Va. 616, 622 (1966) (citing, inter alia, William L. Prosser, Handbook of the Law of Torts 242 (3d ed. 1964)).  The second step is proximate causation, "one of the nebulous and mystifying creatures of the law," *Gregory v. Lehigh Portland Cement Co.*, 157 Va. 545, 555 (1932).  "Proximate cause has been described as a shorthand descriptive phrase for the limits the law has placed upon an actor's responsibility for his conduct." *Wells*, 207 Va. at 622 (citing Prosser, *supra*, at 240).

 

*Id.* at 46, 48. In addition, the steps with missing edge treads do not appear from these photographs to have been repaired with concrete patches, an observation consistent with AlBritton's claim of "missing edge pieces of concrete," *id.* at 2.

None of these allegations surprised the prison officials when they received AlBritton's lawsuit. Prior to this litigation, they knew that AlBritton had claimed "that he fell down a flight of stairs . . . due to a missing piece of concrete on the steps, severely injuring himself." *Id.* at 18; *see also id.* at 21, 40, 42. They also acknowledged that "steps in that area have missing edge pieces on the runners." *Id.* at 40. They did not believe, however, that the missing edge pieces had caused AlBritton to fall because there were no "protrusions that would have caused a trip, slip or fall," and thus, the "missing edge pieces on the runners" had not "cause[d] the staircase to be defective." *Id.* "This is the very reason offenders must follow orders," the investigating prison official reasoned, "and take their showers on the tier that they live." *Id.* Relevant to that last point, the official observed that AlBritton was "carrying [his] shower bag loosely next to [his] legs while walking down the stairs." *Id.* The Commonwealth reasserted these points in its affidavit in support of its motion for summary judgment. *Id.* at 18-22, 42-43.

We find unpersuasive the Commonwealth's arguments in support of its summary judgment motion. The presence or absence of protrusions may be relevant to the issue of

11

primary negligence, but it is hardly dispositive. Similarly unconvincing is the assertion that the "missing edge pieces on the runners" could not "cause the staircase to be defective," *id.* at 40, because inmates should not take showers on the upper level when they live on the lower level. Whether the stairs were unreasonably dangerous does not turn on who is doing the walking. It may be true and even relevant[9] that the prison rules prohibited AlBritton from using those stairs, but that fact would not make them safe. At any rate, AlBritton's affidavit opposing summary judgment contested the Commonwealth's assertion that the rules had prohibited him from using the staircase. "There was absolutely no Rule or Policy," AlBritton claimed, "stating that I could not take a shower in a [t]op tier shower because I lived on the [b]ottom floor." *Id.* at 78; *see also id.* at 77 (reproducing a page from the inmate orientation manual stating that "[t]he following areas are unauthorized areas" and then listing "Top tier (shower or cell break movement only)"). These factual disputes are genuine, and they involve material facts under common-law principles of liability.

The same can be said about the issue of notice. AlBritton provided affidavits from two inmates that stated that the "missing edge pieces" had been missing for months before the accident. *See id.* at 72-73. Both inmates stated that prison officials, including a former warden, had used the "damaged" staircase on several occasions and that the damage had existed for as long as a year. *Id.* One of the affiants stated that "other offenders" had warned prison officials

---

[9] *See Franconia Assocs. v. Clark*, 250 Va. 444, 446-47 (1995) ("The owner's duty, however, 'does not extend to places beyond the invitation and to which the invitee is not reasonably expected to go.'" (citation omitted)); *Fobbs*, 232 Va. at 229 (noting that the owner's duty of care depends on "the invitee's use consistent with the invitation"); *City of Suffolk v. Hewitt*, 226 Va. 20, 24 (1983) (explaining that "the scope of the invitation" includes places that an invitee "could be reasonably expected to go"); *Raven Red Ash Coal Co. v. Griffith*, 181 Va. 911, 925-26 (1943) ("It is well settled that '[t]he duty which a property owner owes to an invitee is co-extensive with and limited by the invitation.'" (citation omitted)); Kent Sinclair & Charles E. Friend, Personal Injury Law in Virginia § 21.4(E), at 21-38 (4th ed. 2019).

in the affiant's presence "about the damaged steps prior to AlBritton falling." *Id.* at 72. This evidence is sufficient, if believed by the factfinder, to demonstrate "the responsible person's actual or constructive knowledge of a defective condition," *Grim*, 246 Va. at 242; *cf. Winn-Dixie Stores, Inc. v. Parker*, 204 Va. 180, 184 (1990).[10]

The Commonwealth's final argument against primary negligence posits that none of the facts, whether genuinely disputed or not, really matter because they are legally immaterial for two reasons. First, the Commonwealth reads *Williamsburg Shop, Inc. v. Weeks*, 201 Va. 244 (1959), as establishing that the absence of anti-slip treads on a staircase cannot be deemed a negligently created hazard as a matter of law. *See* Appellee's Br. at 17. Second, the Commonwealth contends, again as a matter of law, that AlBritton's case at best involves "nothing more than a defect so slight that it would not endanger travel in the ordinary modes by a person exercising reasonable care for his own safety." *See id.* (quoting *City of Newport News v. Anderson*, 216 Va. 791, 793 (1976)).

On the first point, we take a different view of *Weeks*. The claimant in that case, while wearing 3 1/4-inch high heels, fell down a flight of steps at a shop. *See Weeks*, 201 Va. at 246. When the shop manager came to her aid, she said "that he should not 'worry' because it was not his 'fault,' that 'I tripped on my heel.'" *Id.* Seeking to blunt this uncontested admission at trial, the claimant asserted five different reasons why the shop owner was liable for her fall. One was the "lack of antislip nosings or treads on the steps." *Id.* We rejected this assertion on appeal, *see id.* at 247, but we did not do so because the absence of safety treads on stairs could never, under

---

[10] The Commonwealth's motion for summary judgment did not assert that the alleged defect was open and obvious, thus obviating any duty to make it safe. *See Fultz*, 278 Va. at 89; *Fobbs*, 232 Va. at 229. Because the parties do not address the open-and-obvious doctrine in this appeal, we do not consider its applicability, if any, to this case.

any circumstances, constitute negligence.  Nor have we said as much in any later case.  *See, e.g.*, *Culpepper v. Neff*, 204 Va. 800, 805 (1964) (holding that "[i]t was for the jury to determine whether the depression in the marble floor and the worn edges of the stair treads created a dangerous situation").  Instead, in *Weeks*, we merely observed that the assertion that liability resulted from the absence of anti-slip treads could not overcome the concession at trial by the claimant's expert witness that "the absence of such [anti-slip treads] did not make the stairway 'unsafe,'" *Weeks*, 201 Va. at 247, and the claimant's uncontested admission to the shop manager that she had simply "tripped on [her] heel," *id.* at 246.

The Commonwealth's second argument for viewing the genuinely disputed facts as immaterial misplaces reliance on our line of precedent addressing public and private sidewalks.  In several such cases, we have observed that slightly uneven sidewalks are so common — and thus foreseeable to the ordinary person — that they cannot justify the imposition of tort liability.[11]  In such cases, the imperfection is "nothing more than a defect so slight that it would not endanger travel in the ordinary modes by a person exercising reasonable care for his own safety." *Anderson*, 216 Va. at 793.  This category of cases rests on the pragmatic view that "[a] municipality need only maintain its sidewalks in a reasonably safe condition for travel in the ordinary modes.  It is not expected, nor is it required, to keep the surface of its sidewalks perfectly level and even." *Id.* at 792-93.

"We have cautioned," however, that "the duty owed by municipal corporations to sidewalk pedestrians is not necessarily 'appropriate to the owner-invitee context.'" *Medical Ctr.*

---

[11] Examples include sidewalk depressions 1/2-inch lower than adjacent segments, *see Medical Ctr. Hosps. v. Sharpless*, 229 Va. 496, 498 (1985); *Anderson*, 216 Va. at 792, another sidewalk depression 1 5/8-inches lower than adjacent segments, *see Childress v. City of Richmond*, 181 Va. 267, 269 (1943), and yet another sidewalk depression 1 1/8-inches lower than adjacent segments, *see City of Roanoke v. Sutherland*, 159 Va. 749, 752 (1933).

*Hosps. v. Sharpless*, 229 Va. 496, 498 (quoting *Mary Washington Hosp., Inc. v. Gibson*, 228 Va. 95, 102 (1984)). Generalizations that may be reasonable in one context may be unreasonable in another — like this case for example. Most people assume outdoor sidewalks are not going to be perfectly level. But most people walking down a staircase from a shower area would not assume that a cascading series of edge treads securing their descent most of the way down would suddenly disappear on the last several steps. The slightly defective sidewalk cases, therefore, do not support the entry of summary judgment in this case.

3.

The circuit court also entered summary judgment on the alternative ground that "the evidence demonstrates [AlBritton] was contributorily negligent." J.A. at 83. Because the Commonwealth had the burden of proof on this affirmative defense, the motion for summary judgment could succeed only if there were no genuine issues of material fact — which, in this case, means that no reasonable factfinder applying the governing legal standard could conclude that AlBritton was *not* contributorily negligent. *See supra* at 8; *see, e.g.*, *Wright v. Norfolk & W. Ry.*, 245 Va. 160, 170 (1993).

In the circuit court, the Commonwealth's affidavit asserted two facts in support of summary judgment on this issue: First, AlBritton "was in an unauthorized area taking a shower," J.A. at 43, and should not have been on that staircase. Second, AlBritton was "carrying his [shower] bag loosely near his legs" when he fell. *Id.* at 43-44. AlBritton denied both assertions. He claimed that "no Rule or Policy" had forbid him from showering on the upper floor and that "all offenders in the Pod" were authorized to shower upstairs. *Id.* at 78; *see also id.* at 77 (reproducing a page from the inmate orientation manual). AlBritton also "vehemently" denied walking down the steps "with his shower bag hanging near his legs." *Id.* at 60. Given the

15

state of the record on the issue of contributory negligence, we see no need to elaborate on our view that it was plainly wrong for the circuit court to enter summary judgment on this ground.

On appeal, however, the Commonwealth contends that we should not offer an opinion on the circuit court's contributory-negligence ruling because AlBritton failed to properly raise the point in his assignment of error. If that were true, it would truncate the appeal and result in a summary affirmance because contributory negligence, when proven, is an absolute bar to recovery on a simple negligence claim. *See Smith v. Virginia Elec. & Power Co.*, 204 Va. 128, 133 (1963). An absolute bar to recovery, when unchallenged on appeal, moots every other argument asserted in support of a recovery. *See generally Manchester Oaks Homeowners Ass'n*, 284 Va. at 422 (describing the consequence of failing to challenge on appeal each "separate and independent basis for the judgment" (citation omitted)).

AlBritton's assignment of error asserts that the circuit court "erred and abused its discretion in [g]ranting the defendant Commonwealth's Motion for Summary Judgment for [c]ontributory negligence based solely upon the inadmissible [h]earsay [e]vidence submitted by the defense." Appellant's Br. at 3. The Commonwealth observes that AlBritton's opening brief does not identify any specific hearsay statements that were inadmissible. While that observation is true, the question is whether AlBritton limited his challenge exclusively to an error arising out of the circuit court's consideration of inadmissible hearsay and, therefore, whether we should refuse to review AlBritton's arguments that fall outside of that narrow issue.

The answer to that question would easily be "yes" if the assignment of error stated, "The summary judgment was error *because* the court relied on inadmissible hearsay." Used as a subordinating conjunction, "because" links the error to the hearsay. If a brief assigned error on this ground and then said not a word about hearsay, we would consider the issue waived — not as an insufficient assignment of error under Rule 5:17(c)(1)(iii) but as an inadequately developed

16

argument supporting an assignment of error (colloquially called a bad-brief waiver) in violation of Rule 5:27(d).[12]

AlBritton's assignment of error, however, challenges the entry of an erroneous summary judgment "based solely upon the inadmissible [h]earsay [e]vidence submitted by the defense." Appellant's Br. at 3. AlBritton argues that the phrase "based upon" is best read as being descriptive in nature. The fairest interpretation of his assignment of error, he contends, is simply that the circuit court erred in entering summary judgment based solely upon the Commonwealth's evidence without considering his evidence. Thus, the words "inadmissible [h]earsay," regardless of whether they are correct, are mere surplusage.

Given the grammatical syntax of the assignment of error, we believe AlBritton has the better argument. As Professor Garner points out, the phrase "based on" has multiple uses, some correct and some incorrect. Bryan A. Garner, Modern American Usage 85-86 (2003). It "may carry a verbal force" when "base" is used as a transitive verb, or it may "in a passive sense . . . carry adjectival force" when "based" is used as an adjective, but it should never be used as either an adverb or preposition. *Id.* at 85. When improperly used as an adverbial phrase, "based on" might function the same as the phrase "because of." *See id.* Giving AlBritton the benefit of the doubt — that he intended to use the phrase properly — we hold that he did not waive his argument.

---

[12] Usually bad-brief waiver applies to situations in which an appellant makes a cursory argument in support of an assignment of error and fails to provide sufficient legal reasoning, factual analysis, or citations to authority. *See Coward v. Wellmont Health Sys.*, 295 Va. 351, 367 (2018) ("As we have often said, 'Lack of an adequate argument on brief in support of an assignment of error constitutes a waiver of that issue.'" (quoting *Andrews v. Commonwealth*, 280 Va. 231, 252 (2010))). The waiver principle similarly applies when the argument on brief, even if carefully crafted and legally persuasive, nonetheless has little, if anything, to do with the assignment of error.

III.

In sum, the circuit court erred in granting the Commonwealth's plea in bar and its motion for summary judgment. We reverse the final judgment and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*